462 F.3d 161
 Margarita López TORRES, Steven Banks, C. Alfred Santillo, John J. Macron, Lili Ann Motta, John W. Carroll, Philip C. Segal, Susan Loeb, David J. Lansner, Common Cause/NY, Plaintiffs-Appellees,
v.
NEW YORK STATE BOARD OF ELECTIONS, Neil W. Kelleher, Carol Berman, Helen Moses Donohue, and Evelyn J. Aquila, in their official capacities as Commissioners of the New York State Board of Elections, Defendants-Appellants,
 New York County Democratic Committee, New York Republican State Committee, Associations of New York State Supreme Court Justices in the City and State of New York, and Justice David Demarest, individually, and as President of the State Association, Defendants-Intervenors-Appellants,
Eliot Spitzer, Attorney General of the State of New York, Statutory-Intervenor-Appellant.
 
 Docket No. 06-0635-CV.
 United States Court of Appeals, Second Circuit.
 Argued June 7, 2006.
 Decided August 30, 2006.
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Frederick A.O. Schwarz, Jr., Brennan Center for Justice at NYU School of Law (Deborah Goldberg, James Sample, Adam H. Morse, on the brief), New York, NY, for Plaintiffs-Appellees.
 Kent A. Yalowitz, Arnold & Porter LLP (Angela D. Givens, Glynn Spelliscy, Elizabeth A. Wells, J. Alex Brophy, Amalia Jorns, on the brief), New York, NY, for Plaintiffs-Appellees.
 
 
 1
 Jeremy M. Creelan, Jenner & Block LLP (Brian Hauck, Elizabeth Valentina, Carletta F. Higginson, on the brief), New York, NY, for Plaintiffs-Appellees.
 
 
 2
 Andrew J. Rossman, Akin Gump Strauss Hauer & Feld LLP (Steven M. Pesner, James P. Chou, James E. d'Auguste, Vincenzo A. DeLeo, Jamison A. Diehl, on the brief), New York, NY, for Defendant-Intervenor-Appellant New York County Democratic Committee.
 
 
 3
 Arthur W. Greig, New York, NY, for Defendant-Intervenor-Appellant New York County Democratic Committee.
 
 
 4
 Todd D. Valentine, Special Counsel to State Board of Elections, Albany, NY, for Defendants-Appellants New York State Board of Elections, Neil W. Kelleher, Carol Berman, Helena Moses Donohue, and Evelyn J. Aquila.
 
 
 5
 Carter G. Phillips, Sidley Austin LLP, Washington, D.C., for Defendant-Intervenor-Appellant New York Republican State Committee.
 
 
 6
 Joseph L. Forstadt, Stroock & Stroock & Lavan (Ernst H. Rosenberger, Kevin J. Curnin, David Sifre, Mary A. Gorman, on the brief), New York, NY, for Defendants-Intervenors-Appellants Associations of New York State Supreme Court Justices in the City and State of New York and the Hon. David Demarest.
 
 
 7
 Caitlin J. Halligan, Solicitor General (Eliot Spitzer, Attorney General of the State of New York, Robert H. Easton, Mariya S. Treisman, Joel Graber, on the brief), New York, NY, as Statutory-Intervenor-Appellant and Counsel for Amicus Curiae New York State Legislature.
 
 
 8
 Adrian Zuckerman, Lowenstein Sandler PC (Robert C. Boneberg, Andrew R. Tulloch, Franklin R. Weissberg, on the brief), New York, NY, for Amicus Curiae Women's Bar Association of the State of New York.
 
 
 9
 Steven De Castro, Law Office of Steven De Castro, New York, NY, for Amici Curiae Boards of the Metropolitan Black Bar Association, Dominican Bar Association, Korean American Lawyers Association of Greater New York, and James F. Castro-Blanco, Esq., Eliezer Rodriguez, Esq., and Fiordaliza A. Rodriguez, Esq., in their individual capacities.
 
 
 10
 John Z. Marangos (Denise Marangos, Robert Mulhall, on the brief), Staten Island, NY, for Amicus Curiae Richmond County Bar Association.
 
 
 11
 Christopher W. Chan (Steven B. Shapiro, on the brief), New York, NY, for Amicus Curiae Asian American Bar Association of New York.
 
 
 12
 Preeta D. Bansal, Skadden, Arps, Slate, Meagher & Flom LLP (Sheila L. Birnbaum; Bettina B. Plevan, President, The Association of the Bar of the City of New York, on the brief), New York, NY, for Amicus Curiae Bar of the City of New York.
 
 
 13
 Jonathan R. Dowell, Heller Ehrman LLP (Holly K. Kulka, Ellen G. Jalkut, Anh P. Le, on the brief), New York, NY, for Amicus Curiae Former New York State Judges.
 
 
 14
 Mariann Meier Wang, Emery Celli Brinckerhoff & Abady LLP, New York, NY, for Amici Curiae The Asian American Legal Defense and Education Fund, The Puerto Rican Legal Defense and Education Fund, The Puerto Rican Bar Association, Latino Lawyers Association of Queens County, Inc., The Center for Law and Social Justice, The Amistad Black Bar Association of Long Island, and the Rochester Black Bar Association.
 
 
 15
 Monique Ferrell, Assistant District Attorney (Charles J. Hynes, District Attorney, Kings County, on the brief), Brooklyn, NY, for Amicus Curiae Charles J. Hynes, District Attorney, Kings County.
 
 
 16
 Norman L. Reimer, President, New York County Lawyers' Association, (Peter Bienstock, Stephanie G. Wheeler, Bradley P. Smith, Christopher F. Nelson, on the brief), New York, NY, for Amicus Curiae New York County Lawyers' Association.
 
 
 17
 Katherine B. Forrest, Cravath, Swaine & Moore LLP (Joanne M. Gentile, Daniel P. Murphy, on the brief), New York, NY, for Amicus Curiae Fund for Modern Courts.
 
 
 18
 Bruce S. Kaplan, Friedman Kaplan Seiler & Adelman, LLP (Gaurav I. Shah, Laurence D. Borton, Jonathan Gottfried; Edward I. Koch, Bryan Cave LLP, on the brief), New York, NY, for Amicus Curiae Edward I. Koch.
 
 
 19
 Tom Stein, Proskauer Rose LLP (Charles Sims, Peter Sherwin, on the brief), New York, NY, for Amicus Curiae Citizens Union of the City of New York.
 
 
 20
 Arthur N. Eisenberg (Steven Alan Reiss, David R. Singh, William R. Cruse, Weil, Gotshal & Manges LLP, on the brief), New York, NY, for Amicus Curiae New York Civil Liberties Union.
 
 
 21
 Christopher Earl Strunk, Brooklyn, NY, pro se as amicus curiae.
 
 
 22
 Before: STRAUB, SOTOMAYOR, and HALL, Circuit Judges.
 
 
 23
 STRAUB, Circuit Judge.
 
 
 24
 This case requires us to peer inside New York State's political clubhouses and determine whether party leaders have arrogated to themselves a choice that belongs to the people. The task falls to us by way of interlocutory appeal. Specifically, defendants-appellants appeal from the grant of a preliminary injunction by the District Court for the Eastern District of New York (John Gleeson, Judge).
 
 
 25
 In its opinion and order, the District Court found a clear likelihood that New York State's process for nominating Supreme Court Justices violates the First Amendment rights of plaintiffs-appellees, who consist of judicial candidates, Republican and Democratic voters from across the state, and the non-profit group Common Cause/NY.[1] Accordingly, the Court preliminarily enjoined defendants-appellants New York State Board of Elections and its commissioners from enforcing the statutory provisions that regulate the nominating process. Although the Court declined to order the State Legislature to enact a new nominating system, it required that nominations for the office of Supreme Court Justice proceed by primary election until the Legislature enacts a new scheme of its own accord. The District Court then stayed its order until after this year's election cycle, scheduled to conclude in November.
 
 
 26
 The precise issues presented are whether the District Court exceeded its discretion in (1) finding a clear likelihood that New York State's system for nominating its Supreme Court Justices violates the First Amendment, and (2) remedying that violation by (a) facially enjoining the relevant statutory provisions and (b) requiring that Supreme Court Justice nominations be settled through primary elections until the State Legislature enacts corrective legislation. We hold that the District Court acted within its allowable discretion on all scores.
 
 
 27
 Given the number of issues involved, we set out the following table of contents:
 
 
 28
 BACKGROUND .................................................................... 171

 I. NEW YORK STATE'S ELECTORAL SCHEME ...................................... 171
 A. The Primary Election ................................................ 172
 B. The Delegate Lobbying Period ........................................ 176
 C. The Nominating Conventions .......................................... 178
 D. The General Election ................................................ 178
 E. The Candidacy of Margarita López Torres ............................. 178

 II. PROCEDURAL HISTORY .................................................... 181
DISCUSSION .................................................................... 183

 I. THE DISTRICT COURT DID NOT EXCEED ITS ALLOWABLE DISCRETION IN
 CONCLUDING THAT PLAINTIFFS DEMONSTRATED A CLEAR LIKELIHOOD OF
 SUCCESS ON THEIR FIRST AMENDMENT CLAIM ................................ 183
 A. Standard of Review .................................................. 183
 B. Substantive First Amendment Law ..................................... 183
 C. The District Court Did Not Find and Apply An Overly Broad First
 Amendment Right of Association .................................... 185
 1. The First Amendment's Guarantee of Freedom of Association
 Applies to New York's Judicial Nominating Process .............. 185
 
 
 29
 2. The First Amendment Guarantees Voters and Candidates a
 Realistic Opportunity to Participate in the Nominating
 Phase Free From Severe and Unnecessary Burdens ................. 187

 3. The District Court Recognized and Applied
 the Appropriate First Amendment Right .......................... 188

 D. A Delegate-Based Nominating Convention System Is Not Per Se
 Constitutional .................................................... 189

 E. The Associational Rights of Political Parties Do Not Justify New
 York's Nominating Scheme .......................................... 190

 F. The Existence of an Alternate Means of Access to the General
 Election Ballot Does Not Automatically Render Constitutional
 New York's Regulation of the Primary Election Ballot and Nominating
 Convention ........................................................ 193

 G. The Burdens Imposed by N.Y. Elec. L. §§ 6-106, -124 Are Severe ...... 195
 1. The District Court Properly Assessed the Burdens from the
 Standpoint of a Reasonably Diligent Candidate Who Lacks
 the Support of Party Leadership ................................ 195

 2. New York's Judicial Election Process Severely Burdens the
 Associational Rights of Voters and Candidates .................. 196

 H. The District Court Properly Concluded that New York's Electoral
 Scheme Is Not Narrowly Tailored to Further A Compelling State
 Interest .......................................................... 201

 II. THE DISTRICT COURT WAS NOT REQUIRED TO PROVIDE NOTICE PURSUANT TO
 FED. R. CIV. P. 65(A)(2) .............................................. 204

 III. THE DISTRICT COURT DID NOT EXCEED ITS ALLOWABLE DISCRETION IN
 ORDERING THAT JUDICIAL NOMINATIONS PROCEED VIA PRIMARY ELECTION
 UNTIL THE LEGISLATURE ENACTS CORRECTIVE LEGISLATION ................... 204

 A. General Remedial Principles ......................................... 204
 B. The District Court Acted Within Its Discretion in Crafting a
 Remedy ......... 205

CONCLUSION .................................................................... 208
 
 BACKGROUND
 I. New York State's Electoral Scheme
 
 30
 In the country's other 49 states, the term "Supreme Court Justice" might signify a member of the highest appellate court. In New York, however, that term denotes a judge of the State's general jurisdiction trial court. Apart from peculiar terminology, New York employs a method of selecting its Supreme Court Justices that is unique in the nation.
 
 
 31
 In 1846, New York amended its constitution to require that Supreme Court Justices be popularly elected. In particular, Article VI, section 6 of the state constitution provides, "The justices of the supreme court shall be chosen by the electors of the judicial district in which they are to serve." N.Y. Const. art. VI, § 6(c). Since adopting that constitutional provision, New York has experimented with different methods of effecting its guarantee of public choice.
 
 
 32
 At first, the State's political parties employed conventions to designate their Supreme Court nominees. That all changed in 1911, when the State Legislature, buoyed by a wave of progressive politics, provided for nominations by primary election. However, over the next decade, concern grew that bare-knuckled primary elections dissuaded qualified candidates from seeking these significant judicial positions. As to those brave enough to enter the contest, observers worried that the need to raise large sums of money might compromise their independence, or at least appear to do so, and lodge effective control of the nominating process in the hands of political bosses who directed their party's large election apparatus.
 
 
 33
 As a result of those concerns, in 1921 New York recast the electoral process for Supreme Court Justices. The Legislature did not entirely dispense with primary elections. Instead, it enacted a three-part scheme that combines a primary election, a nominating convention, and a general election.[2] During the first phase, the State holds a primary election at which rank-and-file party members elect judicial delegates. N.Y. Elec. L. §§ 6-106, -124. Next, those delegates attend a convention at which they select their party's nominees. N.Y. Elec. L. §§ 6-106, -124, -158. The individual so chosen automatically receives a place on the general election ballot. N.Y. Elec. L. § 7-116(1). Last, the State holds a general election at which Justices are elected. N.Y. Elec. L. § 8-100(1)(c).
 
 
 34
 Having described the basic form of the judicial election process, we next examine in greater detail the manner in which that process actually functions. In so doing, we rely on the facts found by the District Court during a comprehensive preliminary injunction hearing, and which we conclude are not clearly erroneous. That hearing spanned 13 days and included testimony from 24 witnesses. The District Court admitted 10,000 pages of documentary evidence and nearly 500 pages of proposed fact findings and legal conclusions. With the benefit of that robust record and the District Court's findings, we next describe the reality of Supreme Court elections in present-day New York.
 
 A. The Primary Election
 
 35
 A network of district lines defines the primary election battlefield. Each judicial candidate stands for election in a particular judicial district. New York currently is divided into 12 judicial districts. N.Y. Const. art. VI, § 6(a), (b). In turn, each judicial district encompasses several other smaller political subdivisions known as assembly districts. See generally N.Y. Const. art. III, § 5. Because judicial districts are so large, each one comprises at least nine assembly districts and as many as 24. The appendix to this opinion contains a map of New York State showing all county borders and assembly and judicial district lines, as well as a similar map of New York City. The appendix also contains individual maps of the First, Second, Tenth, Eleventh, and Twelfth Judicial Districts.
 
 
 36
 As noted above, judicial candidates do not run in the primary election themselves. Instead, they have the option of assembling a slate of delegates to run on their behalf, with an eye toward placing those delegates at the judicial nominating convention so that they can cast their votes in favor of the candidate with whom they are affiliated. N.Y. Elec. L. §§ 6-106, -124. This entire slate of delegates, however, does not run for election as one group across the entire judicial district. Instead, small subgroups of delegates stand for election within each assembly district comprising the larger judicial district. N.Y. Elec. L. § 6-124. In this fashion, the primary election consists of a series of contests between groups of delegates within each assembly district.
 
 
 37
 New York allows each political party to determine how many delegate slots to allot per assembly district, but requires that this number "be substantially in accordance with the ratio, which the number of votes cast for the party candidate for the office of governor, on the line or column of the party at the last preceding election for such office, in any unit of representation, bears to the total vote cast at such election for such candidate on such line or column in the entire state." N.Y. Elec. L. § 6-124. State law also allows each political party to provide for an equal number of "alternate delegates" who may attend the convention and vote in the place of delegates who do not attend, which, as described, below, is a common event. Id. The political parties use various formulae to set these numbers. For example, the state Democratic Party begins with a baseline of one delegate and one alternate for each assembly district. It then adds one delegate and one alternate for every 2,500 votes cast on the party's ballot line in the previous gubernatorial election. See Rules of Democratic Party of the State of New York, art. II, § 5. The Republican Party uses a similar formula. See Rules of the New York Republican State Committee, § 18. Although these formulae allot a handful of delegates to each assembly district, the aggregate allotment across an entire judicial district is quite large. In 2004, for example, the parties allotted each judicial district at least 64 total delegates and as many as 248, including alternates.
 
 
 38
 To appear on the primary ballot, the delegates must circulate designating petitions within the assembly district in which they are running. Within a span of 37 days, each slate of delegates must gather 500 valid signatures from party members residing in that assembly district. N.Y. Elec. L. §§ 6-134(4), -136(2)(i), (3). Each party member may sign only one petition. N.Y. Elec. L. § 6-134(3). Consequently, the number of available signatories shrinks each time a party member signs a designating petition.
 
 
 39
 Further, because petition signatures are routinely and successfully challenged pursuant to the one-petition signature rule, among others, each delegate slate must realistically gather between 1,000 and 1,500 signatures to gain a primary ballot position. Taking the lower figure of 1,000 signatures per assembly district, in order to run a full complement of delegates, a judicial candidate must gather at least 9,000 signatures (in the judicial district with only nine assembly districts) and as many as 24,000 signatures (in the judicial district with 24 assembly districts). In addition, because each group of delegates runs in a different assembly district, the signatures must be gathered from a variety of particular subdivisions spread throughout the entire judicial district.
 
 
 40
 At the close of the petitioning period, the State Board of Elections determines which assembly districts present contested delegate races. If only one group of delegates has filed designating petitions in an assembly district, then those delegates are "deemed elected." N.Y. Elec. Law § 6-160(2). Delegates who are "deemed elected" do not appear on the primary ballot. Id.
 
 
 41
 Once the delegates achieve ballot status in contested races, they may not indicate on the ballot the judicial candidate with whom they are affiliated. Accordingly, in order to run delegate slates in any useful fashion, the judicial candidate must inform the primary electorate in each assembly district of which delegates are pledged to her in that specific locale. In the Second Judicial District, for example, which encompasses Brooklyn and Staten Island, a judicial candidate who ran a slate in each assembly district would have to mount 24 different voter education campaigns. In the Fourth Judicial District, which encompasses roughly one quarter of the State's land, a judicial candidate seeking to run a slate in each assembly district must conduct 10 different voter education campaigns across 11 different counties.
 
 
 42
 Three current or former judges, including plaintiff Margarita López Torres, averred that the process described above often shuts out candidates lacking either great wealth or the benefit of a political party's county-wide apparatus. According to those judges, the requirements of the process—recruiting large numbers of delegates and alternates, assembling different delegate slates in each assembly district, recruiting petition circulators, collecting several thousand signatures, and conducting a host of localized voter education campaigns—effectively foreclosed their ability to access the primary election phase.
 
 
 43
 For example, when a former City Court Judge ran for Supreme Court Justice in the Seventh Judicial District, he found that recruiting and running slates of delegates was "not a realistic option." To compete in the primary election, he would have had to "recruit over 55 people to represent the 11 Assembly Districts that were within [his] Judicial District ... each of whom would have had to be willing to contribute significant energy, time, and money." Finding that he would not be able to recruit this many delegate candidates, he pared down the list to the absolute minimum of delegates he thought he needed to elect to be competitive. Even if he were able to recruit enough delegate candidates, the signature requirements were daunting: he would have to recruit "several dozen people to work full-time at gathering" at least 9,000 signatures over the course of 37 days. Although an experienced campaigner who was active in county politics for several years prior to running for the Supreme Court, the lower court judge concluded that "there was simply no way [he] could overcome these organizational and financial burdens." An Albany City Court Judge, also an experienced campaigner, agreed. After attempting to recruit, organize, and run slates of delegates who were independent of the party leadership in the Third Judicial District, he concluded that the process presented "insurmountable structural and practical barriers."
 
 
 44
 Like those two judges, Civil Court Judge Margarita López Torres found that the various delegate and petitioning requirements created impossibly high entry barriers for candidates lacking institutional support—even for those who possessed significant public support. López Torres was an experienced and successful campaigner who twice won countywide election to the Civil Court in Brooklyn—no simple feat considering that Brooklyn includes several million people of myriad racial, ethnic, religious, and socioeconomic backgrounds. In one recent election for Civil Court Judge, she received over 200,000 votes—more than any Democratic candidate for Supreme Court Justice received in Brooklyn that year.
 
 
 45
 Yet López Torres, who sought the Democratic nomination for Supreme Court Justice on several occasions, found that the "burdens and barriers to organizing such [delegate] campaigns are truly insurmountable" for those candidates who lack the "county party leaders' backing." Faced with those barriers in her 1998 campaign for Supreme Court Justice, she realized "that [she] had no realistic chance" to fulfill the primary election balloting requirements despite her substantial public support. Accordingly, she "ended [her] bid for the [Democratic] nomination" for Supreme Court Justice.
 
 
 46
 While these regulations effectively prohibit candidates who lack the support of the party leadership from putting their slates of delegates on the primary election ballot, candidates backed by the local party leadership easily navigate the primary system with the benefit of the party's pre-existing apparatus. Within each county, the party leadership consists of the county leader, who chairs the party's county committee, and a group of assembly district leaders, who serve as members of the party's state committee and may also serve as members of the party's executive county committee.[3] Although there is some variation between parties and counties, typically two district leaders—one male, one female—are elected from each assembly district within the county, so the party's network is spread throughout the region. See N.Y. Elec. L. §§ 2-102, -104; Rules of Democratic Party of the State of New York, art. II, §§ 1-2; Rules of the New York Republican State Committee § 1; Rules and Regs. of the Democratic Party of the County of New York, art. II, §§ 1-4; art. III, § 1. We refer to candidates backed by a party's county leaders as "party-backed candidates."
 
 
 47
 This party leadership recruits judicial delegate candidates, alternate candidates, and petition circulators. The party then simply includes its delegate candidates on the omnibus designating petitions it circulates during every primary election cycle, which may include candidates for the State Legislature, lower courts, and even Congress. In that way, the party leadership ensures that its group of loyal, hand-picked delegate candidates achieves ballot status as a matter of course.
 
 
 48
 Defendants' own expert witness, New York City Board of Elections Commissioner Douglas Kellner, testified that the primary system is designed to produce this remarkable disparity between "individual" candidates' and party-backed candidates' ability to compete. Kellner certainly is in a position to know. He served as Law Chair of the New York County Democratic Party, has attended "every judicial nominating convention of the Democratic Party in the First Judicial District since 1976," and often operated as the county leader's right-hand man at those conventions. According to Kellner, regardless of the fact that the electoral scheme ostensibly provides for an open primary election, "the idea that an individual candidate would go out and recruit delegate candidates and run delegates pledged to that candidate in the primary is not the system and it twists the design of the system on its head."
 
 
 49
 The process of running a slate of delegates on the primary election ballot is so beset with obstacles that nearly all candidates recognize the attempt as a fool's errand and do not even try. In the normal course, only one slate of delegates—that supported by local party leadership—even files a designating petition. The uncontested slate is then "deemed elected" by operation of law and does not appear on the primary ballot. This kind of invisible, automatic "election" is the norm rather than the exception. Between the years 1999 and 2002, four of the State's counties—Albany, Nassau, Suffolk, and Tompkins—did not field one single contested delegate race in any of their assembly districts.
 
 
 50
 In New York City, the situation is only slightly improved. Between 1999 and 2003 in the First, Second, Eleventh, and Twelfth Judicial Districts, only 12.7 percent of delegate elections were contested, and these contested races occurred only in portions of the judicial districts. Accordingly, in 87.3 percent of delegate races over that four-year period, voters did not even see the delegates' names on the ballot, much less have the opportunity to vote them up or down.
 
 B. The Delegate Lobbying Period
 
 51
 Political parties hold their judicial nominating conventions one to two weeks after the judicial delegates are elected. N.Y. Elec. L. §§ 6-124, -126, -158(5). During that interim period, any Supreme Court Justice aspirant, whether or not she sought to have delegates elected at the primary election, theoretically may lobby the delegates for support. However, the evidence established that for two reasons, a candidate who lacks the support of her party's leadership has no actual opportunity to lobby delegates.
 
 
 52
 First, the time frame for lobbying delegates is unrealistically brief. In contested delegate elections, candidates have only two weeks to lobby at least 64 delegates and as many as 248, depending on the judicial district in which they were running. Where the delegate elections are uncontested, the delegates-elect theoretically may be known as early as July, when the nominating petitions are due. As we will explain, however, at least one candidate who attempted to obtain the names of delegates prior to the primary found her effort thwarted by local party officials.
 
 
 53
 More importantly, delegates do not exercise their own judgment when deciding which candidate to support. Instead, they endorse the choice of the entity with which they are affiliated and to which they are subject. As set forth above, in the case of almost all delegate slates that achieve ballot access, that entity is the local party leadership. Defense expert Kellner admitted as much: "By definition, the convention system is designed [so] that the political leadership of the party is going to designate the party's candidates. Specifically, judicial delegates are part of the party leadership and responsive to it and make it up, you know, constitute the party leadership."
 
 
 54
 Henry Berger, the former Chairman of New York's Commission on Judicial Conduct, as well as a former district leader and judicial delegate, agreed that there is a close organizational affiliation between the county leaders, district leaders, and judicial delegates. Berger described that county leaders exert control over their committee members, i.e., the district leaders, who in turn exert control over the delegates: "In my experience, the district leaders almost always follow the wishes of the county party chairperson when it comes to voting for Supreme Court candidates at the convention. In turn, the delegates follow the wishes of the district leaders who have selected them and support the county party chairperson's chosen candidates." Berger testified that this dynamic was so established in the Second and Twelfth Judicial Districts that party officials told him the names of the judicial nominees even before the delegates—who purportedly select the nominees—were even elected.
 
 
 55
 A professor of sociology from the University of Washington who served as a defense expert described a process in the Eleventh and Twelfth Judicial Districts by which, according to one participant, delegates offer and unanimously confirm nominees though "they don't even know how to pronounce their name[s]." As to the Ninth Judicial District, a longtime judicial delegate averred that because it is "practically impossible" for a candidate to field her own slate of delegates, "county party leaders control the selection of delegates and alternates to the convention." Thus, a candidate's "only path [to the nomination] is to obtain the support of his or her county Party chairman and then seek the blessing of the Westchester County chair."[4]
 
 
 56
 The county leaders' organizational affiliation with the judicial delegates is not the only reason they are able to control them so precisely. Also important is the fact that the party leadership possesses the power to doom a delegate's political career if she should reject its choice for Supreme Court Justice. Assemblymember Herman "Denny" Farrell, who is a district leader, chairman of the New York County Democratic Committee, and State Democratic Party chairman, testified of judicial delegates that, "No one wants to get me angry, so they will not go against me until they have nothing to lose."[5] Similarly, a defense witness who serves as a Manhattan district leader and often served as a judicial delegate testified that "it makes no sense to alienate the [county leader] over a choice of Supreme Court candidate" because "three years down the line when we were seeking something from the county leader . . . he might remember that I didn't support him at a different time." Asked whether he could remember a single instance of a judicial candidate receiving the nomination over Farrell's objection, the district leader replied, "No. I can't remember it ever happening that way."
 
 
 57
 Similarly, two judges testified that in the Third and Seventh Judicial Districts, respectively, the party leadership tapped "reliable people" to be judicial delegates, people who would "adhere to the instructions of each county chairman." Otherwise, as the judges averred, they would be "jeopardizing their political future."
 
 
 58
 The District Court also found that county leaders do not have to issue explicit commands to control the manner in which delegates vote. Defense expert Kellner conceded that at least in some judicial districts, the "leadership of the party . . . hold[s] a meeting before the convention" to "work things out," and then makes nomination "recommendations" to the delegates. Asked whether those "recommendations" were "always followed," Kellner replied, "Generally, yes." Another defense expert admitted that, in the Second Judicial District, "[i]n virtually all cases, the delegates support the candidates supported by their district leader." Similarly, plaintiff and former judicial delegate John W. Carroll testified that delegates are "told" by party leaders "this is the slate we're supporting at the convention" and then "that delegation support[s] that slate," even though the party leadership did not expressly tell the delegation how it should vote.
 
 
 59
 State Senator Martin Connor's actions at the 2002 Democratic Convention in the Second Judicial District further illustrate the power of implicit dynamics. Connor, who was then the minority leader of the New York State Senate, chaired that convention. He testified that Assemblymember Clarence Norman, Jr., who at the time was the Brooklyn county leader, had decided to confer a nomination on a person Connor believed was a "horrible" choice— unqualified and temperamentally unfit for the bench. However, Connor needed Norman's support in order to fend off a challenge to an incumbent Democratic State Senator who was facing a difficult reelection bid in Brooklyn. Accordingly, instead of voicing his objection, Connor simply convened the convention, stepped down as chair, quickly departed, and allowed the nomination to go forward. "I long since learned the value [in] politics of the unspoken thought," he testified.
 
 C. The Nominating Conventions
 
 60
 The evidence showed that the conventions were perfunctory affairs at which no debate occurred. Minutes from conventions held statewide between 1990 and 2002 show that over 96 percent of nominations went uncontested. The overwhelming majority of nominations were by unanimous voice vote. From the record, it appears that a convention chair never has been challenged successfully.
 
 
 61
 Not only were conventions devoid of debate and competition, they were fleeting. Over a 12-year span, conventions statewide averaged a mere 55 minutes in length. In 1996, the Second Judicial District's convention lasted 11 minutes but yielded eight nominees.
 
 
 62
 Given the pro forma nature of conventions, it appears from the record that many delegates do not believe they are worth attending. Even though a delegate's only duty is to attend the convention and vote, and even though delegates publicly run for that privilege just two weeks before the convention, delegate absentee rates are quite high. Over the course of seven years, delegate absentee rates were generally around 25 to 32 percent, but ranged as high as 69 percent—hence the need for so many alternates.
 
 D. The General Election
 
 63
 The final phase of the judicial electoral process is the general election. Empirical evidence showed that because one-party rule is the norm in most judicial districts, the general election is little more than ceremony. Over a 12-year period between 1990 and 2002, almost half of the State's elections for Supreme Court Justice were entirely uncontested, meaning that only one party's candidate appeared on the ballot. In certain judicial districts, contested elections verged on the non-existent. In the Sixth Judicial District, 91 percent of judicial elections were uncontested during the 12-year time span. In the First Judicial District, 85 percent of judicial elections were uncontested. In eight of the State's 12 judicial districts, more than half the elections were uncontested, which left 62 percent of the State's voters with no choice to make on the November ballot.
 
 E. The Candidacy of Margarita López Torres
 
 64
 The experiences of plaintiff López Torres illustrate the manner in which the electoral scheme described above operates to exclude challenger candidates, even those with significant public support. Originally backed by the Kings County Democratic Committee, López Torres won election as a Brooklyn Civil Court Judge in 1992. Soon after her election, two high-ranking committee members directed her to hire a person of their choosing as her law secretary. Given the large caseloads that Civil Court judges must manage, the position of law secretary is a significant one. A law secretary conducts legal research, assists in drafting opinions and orders, schedules cases, and conferences with attorneys.
 
 
 65
 The two party leaders who prevailed upon López Torres were Norman, who was the committee's chair and thus the county party's leader, and Assemblymember Vito Lopez, who was a district leader and a member of the county's executive committee. Through Vito Lopez's "avid sponsorship," López Torres had secured the county party's support for her successful Civil Court candidacy.
 
 
 66
 Norman and Lopez expressed their directive through a letter authored by the Secretary of the Kings County Democratic Committee. That letter set forth that "Clarence and Vito" wished the Secretary to "refer this wonderful gentleman to you as your Law Secretary" and that López Torres should "obtain the necessary paperwork for his employment." The resume of the favored appointee was attached.
 
 
 67
 López Torres interviewed the prospect and contacted his prior employer, a Brooklyn Supreme Court Justice for whom the prospect had served as law secretary. The Justice told López Torres that the law secretary's work was "mediocre" and that "he had spent an enormous amount of time on the phone doing political work." López Torres hired someone else instead.
 
 
 68
 An "extremely upset" Norman later called López Torres and chastised her for refusing the hire. Norman told her that she "did not `understand the way it works.'" Attorneys such as the one he recommended, he explained, "work hard for the Democratic Party's political clubs to get candidates elected" and the law secretary "job is a way to reward them." He demanded that she fire the person whom she had hired on the merits, and hire a person of the party leadership's choosing. López Torres refused. Some day, Norman warned her, she "would want to become a Supreme Court Justice and . . . the party leaders would not forget this." He told her that "without the `County's' support," her Supreme Court nomination "will not happen."[6]
 
 
 69
 Assemblymember Vito Lopez also confronted her. He told her that her refusal to effect the hire was "an embarrassment to him" because he supported her campaign. He demanded that López Torres "make it right" by "hiring the person referred by `County,'" but she again refused. Through an intermediary, he later offered her a chance to redeem herself: if she hired his daughter as her law secretary, he would secure her nomination as the Democratic Party's candidate for Supreme Court Justice. She declined the proposition.
 
 
 70
 As Norman had anticipated, López Torres eventually did aspire to the State Supreme Court bench. She contacted Norman, who requested that they meet at one of Brooklyn's busiest political salt licks, Junior's Restaurant. When López Torres informed Norman that she desired the party's nomination for a vacant Supreme Court Justice position in the Second Judicial District, he predictably declined to support her because her refusal to hire his favored candidate for law secretary was a "serious breach of protocol."
 
 
 71
 Nonetheless, she entered her name for consideration at the upcoming judicial convention. In an "urgent phone call," Norman demanded that she withdraw. Her continued candidacy, he claimed, was a political affront to him, and running in an open convention "was not the way it works." She again rebuffed him. At the convention, not a single delegate proposed her nomination.
 
 
 72
 Undeterred, López Torres sought her party's nomination the following year. The Judicial Screening Committee—a body subject to the control of the county party that ostensibly examines the qualifications of judicial candidates and makes recommendations to the party—interviewed her. However, when she requested the committee's report from Norman and its chairman, Jerome Karp, neither would disclose it. She considered running her own slate of judicial delegates, but realized that such an effort was "impossible" as a practical matter. "There is simply no way I could ever overcome the[] organizational and financial burdens to place delegate candidates on the ballot," she concluded. Without any realistic hope of running her own delegates or receiving Norman's blessing, she withdrew from consideration.
 
 
 73
 Four years later, López Torres yet again sought her party's nomination. Karp informed her that the screening committee would interview only those candidates that Norman referred; Norman, in turn, refused to make the reference. Over the next few months, López Torres pressed Norman for a referral to the committee, but he repeatedly told her that he opposed her candidacy because she had been "disloyal." Since she was unable to run her own contingent of delegates and the screening committee would not even evaluate her, López Torres' candidacy effectively ended.
 
 
 74
 That same year, López Torres ran for reelection to the Civil Court bench. The Kings County Democratic Committee—by now overtly hostile to one of its own elected officials—ran a candidate against her in the primary election. Facing the party-backed candidate in an open primary, López Torres prevailed. In the general election, she received over 200,000 votes— more than any of the Democratic candidates for Supreme Court Justice received in Brooklyn that year.
 
 
 75
 In 2003, the persistent López Torres again sought her party's nomination for Supreme Court Justice. This time, Norman agreed to forward her name to the screening committee. Regardless, in a meeting with López Torres on June 6 he declined to support her because of her past defiance. He also stated that she lacked sufficient support. López Torres pointed out that the prior year she defeated the county party's Civil Court candidate in the primary election and garnered more than 200,000 votes to win the general election. Norman responded that "County" would support only those candidates who supported "County" in turn.
 
 
 76
 López Torres nonetheless attempted to lobby convention delegates. Beginning in March, she wrote repeatedly to the Kings County Democratic Committee requesting the date, time, and place of the convention; the names of the delegates; and whether she could address the delegates at the convention. In September, the committee's Executive Director, Jeffrey C. Feldman, finally responded. He sneered that "a learned jurist, such as yourself, [should] be well aware that [the delegates] stand for independent election in the Primary Election, yet to be held." No list therefore existed "anywhere in the world."
 
 
 77
 As to the prospect of addressing the delegates, Feldman wrote: "While I am neither an attorney nor a graduate of law school, I suffer from the innocent belief that the floor of the Convention is open, only, to elected Delegates and their successors. I am not aware of any Convention in my thirty (30) years of attendance, which permitted a non-accredited member to be accorded the privilege of the floor . . . ." He closed his letter by chastising her for the alleged improper use of a fax machine "in violation of Federal Communication Commission regulations." At the convention, two delegates unsuccessfully attempted to nominate López Torres. After that effort failed, the delegates nominated the slate of candidates that Norman had endorsed.
 
 
 78
 Subsequently, a Brooklyn district leader, who also served as a judicial delegate, penned a letter to the county's other district leaders. He wrote that although López Torres was "highly qualified," he voted against her nomination because she was "an ingrate" who had offended party leadership. Her sin, he explained, was that she "courted Vito Lopez to support her for Civil Court, but then decided she didn't need him anymore and denied his daughter a job."
 
 
 79
 Years of careful study by a number of groups whose reports were in evidence established that López Torres' experience was no anomalous political mugging. In 2003, New York State's Chief Judge, Judith S. Kaye, created the Commission to Promote Public Confidence in Judicial Elections and charged it with determining ways to improve voter participation in the judicial election process. Chief Judge Kaye named as Chairman John D. Feerick, former Dean of Fordham Law School, and as Commissioners two active state Supreme Court Justices, three active Associate Justices of the Appellate Division, one active state Administrative Judge, and a number of other public servants and private practitioners representing each of the State's judicial districts. After studying the nominating process statewide for more than a year, the Commission concluded that "the uncontested evidence before [it] is that across the state, the system for selecting candidates for the Supreme Court vests almost total control in the hands of local political leaders. . . . And in many parts of the State, being on the dominant party's slate is tantamount to winning the election."
 
 
 80
 The Commission is hardly the only entity to reach this conclusion—it merely is the latest. Since 1944 New York's judicial nominating system has been described as exclusionary and boss-dominated; reports and newspaper editorials from that time forward have decried an electoral practice "that mocks choice," and criticized a system in which "voters can never know the candidates and have to accept party slates," while the "real choice is . . . left to political bosses . . . who control nominations."
 
 
 81
 After studying Supreme Court elections for six years, the Fund for Modern Courts concluded that "the selection of Supreme Court justices in New York, is, by and large, a process controlled not by the voters but by political leaders." "[T]he nomination, not the election, is the lynchpin of the judicial selection process," the Fund set forth. "Political leaders, not voters, control judicial conventions and decide who will receive the nomination—and thus who will be the judge." Therefore, "it is not the decision of the voters as to the relative merits of judicial candidates, but the relative strength of the political parties in the judicial districts which determines the outcome of these elections."
 
 
 82
 Less than a decade later, a Task Force on Judicial Diversity appointed by then-Governor Mario Cuomo agreed that, "In practice it is the political party leaders who have the decisive power to determine who will be nominated. Most often this nomination is tantamount to election." "As we all know," the Governor's task force remarked, "our system is only nominally one of election."
 
 II. Procedural History
 
 83
 In March of 2004, plaintiffs brought suit against the New York State Board of Elections and its commissioners pursuant to 42 U.S.C. § 1983, claiming that New York's electoral scheme violates the First and Fourteenth Amendments to the U.S. Constitution. In particular, plaintiffs claim that the system described above violates the First Amendment's guarantee of political association as to Supreme Court Justice candidates and the voters wishing to support them. Plaintiffs also claim that the scheme violates the Equal Protection Clause of the Fourteenth Amendment because it places unequal burdens on the right to vote.
 
 
 84
 In their complaint, plaintiffs sought a declaration that the provisions of state law providing for the electoral scheme described above, see N.Y. Elec. Law §§ 6-106, -124, -158, are unconstitutional. They also sought an injunction requiring the State Legislature to enact a new election scheme, and in the meantime requiring the State to conduct direct primary elections for the office of Supreme Court Justice. In June of 2004, plaintiffs formally moved for that relief.
 
 
 85
 Shortly thereafter, the District Court granted motions to intervene permissively by defendants New York County Democratic Committee, New York Republican State Committee, Associations of New York State Supreme Court Justices in the City and State of New York, and the State Association's President, Justice David Demarest. The District Court also granted a motion to intervene statutorily by Attorney General Eliot Spitzer.
 
 
 86
 In late 2004 the District Court held a 13-day hearing on plaintiffs' motion for a preliminary injunction, during which it admitted the evidence set forth above. In January of 2006, the Court issued a Memorandum and Order granting plaintiffs' motion on First Amendment grounds without considering plaintiffs' equal protection claim. See López Torres v. N.Y. State Bd. of Elections, 411 F.Supp.2d 212 (E.D.N.Y. 2006).
 
 
 87
 In concluding that plaintiffs demonstrated a clear likelihood of success on their First Amendment claim, the District Court made the factual findings described above. In summary, the Court found that (1) it was "virtually impossible" for a candidate lacking the support of the county party to field slates of delegates, id. at 221; (2) county leaders and district leaders "select the delegates and alternate delegates, who, without consultation or deliberation, rubber stamp the county leaders' choices . . . for Supreme Court Justice," id. at 223; and (3) county leaders and district leaders need not issue express commands to control the manner in which delegates vote, id. at 224. Ultimately, the District Court found that "Democratic and Republican Party leaders select the nominees," id. at 231, and that the general election is a mere "formality" at which the party leaders' selections are confirmed, id. at 230-31.
 
 
 88
 In light of those findings, the Court concluded that the electoral system effectively excluded candidates from the nominating process and thus severely burdened voters' and candidates' First Amendment right of association. Applying strict scrutiny, the Court next considered the four interests that defendants asserted to justify the burdens, namely, (1) protecting political parties' right of association, (2) promoting geographic diversity, (3) promoting racial diversity, and (4) protecting judicial independence by insulating judges from the fundraising process and from public backlash due to unpopular decisions. Id. at 250-55. The Court assumed that all of these interests were compelling, but concluded that the electoral system was not narrowly tailored to serve any of them. Id.
 
 
 89
 The Court thus enjoined defendants from enforcing N.Y. Elec. Law §§ 6-106, -124. Id. at 256. Based on a provision of state election law providing for primary elections as the default nominating process, the Court ordered that the State shall conduct primary elections for the office of Supreme Court Justice until the Legislature enacts a new election scheme. Id. at 255-56; see N.Y. Elec. L. § 6-110 ("All other party nominations of candidates for offices to be filled at a general election, except as provided herein, shall be made at the primary election."). The Court declined, however, to order the Legislature to take any action. López Torres, 411 F.Supp.2d at 255-56. By later order, the District Court stayed its injunction until after the 2006 general election, scheduled to conclude with the general election on November 7. Defendants appealed the District Court's January 2006 order, and upon the motion of all parties, we set an expedited briefing schedule.
 
 DISCUSSION
 
 90
 We first address the District Court's ruling on plaintiffs' First Amendment claim, and then the District Court's choice of remedy.
 
 
 91
 I. The District Court Did Not Exceed Its Allowable Discretion in Concluding that Plaintiffs Demonstrated a Clear Likelihood of Success on Their First Amendment Claim
 
 A. Standard of Review
 
 92
 We review the grant of a preliminary injunction for abuse of discretion, "which usually consists of clearly erroneous findings of fact or the application of an incorrect legal standard." Nicholson v. Scoppetta, 344 F.3d 154, 165 (2d Cir.2003) (quotation marks and citation omitted). Where, as here, the relief that plaintiffs seek either (1) stays governmental action taken in the public interest pursuant to a statutory scheme, or (2) mandates an affirmative action, plaintiffs must demonstrate a "clear" or "substantial" likelihood of success on the merits of their claim. Tom Doherty Assoc., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir.1995); see also Hoblock v. Albany County Bd. of Elections, 422 F.3d 77, 96-97 (2d Cir.2005). Accordingly, the ultimate question is whether the District Court exceeded its allowable discretion in concluding that plaintiffs demonstrated a clear likelihood of success on the merits of their First Amendment claim.
 
 B. Substantive First Amendment Law
 
 93
 Nothing in the Constitution requires a state to provide for the popular election of its judges. Republican Party of Minn. v. White, 536 U.S. 765, 788, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002). Even when a state chooses to do so, the Constitution grants it substantial authority to structure the "Times, Places and Manner of holding Elections." U.S. Const. art. I, § 4, cl. 1; see also Tashjian v. Republican Party of Conn., 479 U.S. 208, 217, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986). Nevertheless, once a state exercises its authority to provide for judicial elections, it must comport with constitutional requirements and prohibitions. Specifically, "[i]f the State chooses to tap the energy and legitimizing power of the democratic process, it must accord the participants in that process the First Amendment rights that attach to their roles." Republican Party of Minn., 536 U.S. at 788, 122 S.Ct. 2528 (internal quotation marks omitted and alteration incorporated).
 
 
 94
 The Supreme Court has identified "two different, although overlapping, kinds of rights" that the First Amendment grants: "`the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms.'" Anderson v. Celebrezze, 460 U.S. 780, 787, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (quoting Williams v. Rhodes, 393 U.S. 23, 30-31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968)).
 
 
 95
 While the role of voter "is of the most fundamental significance under our constitutional structure," Burdick v. Takushi, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (internal quotation marks omitted), "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters," Anderson, 460 U.S. at 786, 103 S.Ct. 1564 (internal quotation marks omitted). Accordingly, the Supreme Court has "minimized the extent to which voting rights cases are distinguishable from ballot access cases." Burdick, 504 U.S. at 438, 112 S.Ct. 2059. In either context, "[o]ur primary concern is with the tendency of ballot access restrictions to limit the field of candidates from which voters might choose." Anderson, 460 U.S. at 786, 103 S.Ct. 1564 (internal quotation marks omitted).
 
 
 96
 Yet not every regulation that limits the field of candidates is constitutionally suspect, let alone unconstitutional. As noted above, a state possesses significant power to structure its own elections. Moreover, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." Id. at 788, 103 S.Ct. 1564 (internal quotation marks omitted). Accordingly, in resolving a challenge that pits a State's power to regulate its elections against the rights secured by the First Amendment, we cannot resort to any "litmus-paper test that will separate valid from invalid restrictions." Id. at 789, 103 S.Ct. 1564 (internal quotation marks omitted).
 
 
 97
 Instead, we must first ascertain "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." Id. We must make that assessment not "in isolation, but within the context of the state's overall scheme of election regulations." Lerman v. Bd. of Elections in the City of New York, 232 F.3d 135, 145 (2d Cir.2000). The Supreme Court has underscored that in assessing the extent to which a given set of candidate restrictions burdens First Amendment rights, our review is neither formalistic nor abstract. Instead, we must turn a keen eye on how the electoral scheme functions in fact; indeed, "it is essential to examine in a realistic light the extent and nature of [the scheme's] impact on voters." Bullock v. Carter, 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972).
 
 
 98
 If our realistic assessment yields the conclusion that the electoral scheme lightly or even moderately burdens First Amendment rights, we apply a relaxed standard of review, according to which the restrictions generally are valid so long as they further an important state interest. Lerman, 232 F.3d at 145. On the other hand, if we conclude that a law imposes severe burdens, we apply strict scrutiny, which requires that the law be necessary to serve a compelling state interest. Id.; see also Bullock, 405 U.S. at 147, 92 S.Ct. 849 ("But under the standard of review we consider applicable to this case, there must be a showing of necessity."). With those legal principles as general background, we turn to defendants' claims of error.
 
 
 99
 C. The District Court Did Not Find and Apply an Overly Broad First Amendment Right of Association
 
 
 100
 Defendants' most basic assertion is a unique argument that does not fit easily within the traditional framework set forth above. Instead of focusing on the burdens that this electoral scheme imposes, defendants focus on the affirmative scope of the First Amendment right upon which the District Court based its decision. The District Court erred, defendants maintain, because at bottom its decision rests on an overly broad right of associational freedom, namely, the "right to ... win a major party's nomination."
 
 
 101
 Defendants attack two aspects of this purported right. They claim that the First Amendment does not apply to New York's nominating process because the State has not provided a direct primary election. They next claim that even if the First Amendment does apply, it guarantees only "access to the nominating phase." Defendants refined their second contention at oral argument by claiming further that the First Amendment prohibits only categorical exclusions, such as those based on race or sex, during the nominating phase.
 
 
 102
 We disagree. Below we explain why the First Amendment applies to the nominating phase, describe the scope of protection that it guarantees to voters and candidates, and conclude that the District Court applied the proper standard on the facts of this case.
 
 
 103
 1. The First Amendment's Guarantee of Freedom of Association Applies to New York's Judicial Nominating Process
 
 
 104
 It is true, as defendants contend, that "the processes by which political parties select their nominees are [not] . . . wholly public affairs that States may regulate freely." Cal. Democratic Party v. Jones, 530 U.S. 567, 572-73, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000) (holding that state may not compel political party to allow non-members to vote in its primary elections). But the fact that a political party's nominating process is not "wholly public" does not render the First Amendment inapplicable. Id. Instead, the State must protect First Amendment rights at each "integral part of the procedure of choice," and especially at those junctures of the electoral process that "effectively control[] the choice." United States v. Classic, 313 U.S. 299, 318, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); see also Moore v. Ogilvie, 394 U.S. 814, 818, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969) ("All procedures used by a state as an integral part of the election process must pass muster against the charges of discrimination or of the abridgement of the right to vote.").
 
 
 105
 In Classic, the Supreme Court considered whether Article I, § 2 of the U.S. Constitution secured the right of qualified Louisiana citizens "to vote in the Louisiana [congressional] primary and to have their ballots counted." Classic, 313 U.S. at 307, 61 S.Ct. 1031. That constitutional provision, much like the state provision at issue here, provides that members of Congress "shall be ... chosen" in elections structured by the States. U.S. Const. art. I, § 2. In concluding that Article I, § 2 embraced the right to vote at a primary election, the Court relied on the fact that Louisiana had "exercis[ed] its privilege" to alter "the mode of choice from a single step, a general election, to two, of which the first is the choice at a primary," thereby establishing the primary "by law" as "an integral part of the election machinery." Id. at 316, 318, 61 S.Ct. 1031. The Court also noted that, even if Louisiana had not made the primary an integral part of the election by law, it could not ignore "the fact . . . that the practical influence of the choice of candidates at the primary may be so great as to affect profoundly the choice at the general election." Id. at 319, 61 S.Ct. 1031.
 
 
 106
 Twelve years later, in Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953), the Court concluded that the Fifteenth Amendment's prohibition on race-based voting exclusions applied not just to a primary election, but to a primary election run by a private club called the Jaybird Democratic Association. Id. at 462, 471, 73 S.Ct. 809. Of central importance to the Court's finding of state action, and hence constitutional protection, was the fact that the
 
 
 107
 only election that has counted in this Texas county for more than fifty years has been that held by the Jaybirds from which Negroes were excluded. The Democratic primary and the general election have become no more than perfunctory ratifiers of the choice that has already been made in Jaybird elections. . . . The Jaybird primary has become an integral part, indeed the only effective part, of the elective process that determines who shall rule and govern in the county.
 
 
 108
 Id. at 469-70, 73 S.Ct. 809.
 
 
 109
 Defendants claim that these cases apply only where the state has provided for a direct primary, whereas New York has opted for an indirect delegate primary election followed by a convention at which those delegates vote on the nomination. This variation in the process of public choice does not release the State from its First Amendment obligations. The animating principle in Classic and Terry is that constitutional protection extends to each State-created or State-endorsed "integral part of the election machinery," not merely to one particular kind of primary election. Classic, 313 U.S. at 318, 61 S.Ct. 1031; see also Terry, 345 U.S. at 469, 73 S.Ct. 809; Bullock, 405 U.S. at 146, 92 S.Ct. 849 (holding that primary election ballot filing fee violated Fourteenth Amendment and noting that "the primary election may be more crucial than the general election in certain parts of Texas").
 
 
 110
 Consistent with that view, we previously held that constitutional protection attaches to all integral phases of the nominating process, regardless of whether the nomination is conferred directly by public ballot or indirectly by the votes of elected party officials. In Seergy v. Kings County Republican County Committee, 459 F.2d 308 (2d Cir.1972), we held that the Equal Protection Clause of the Fourteenth Amendment applied to those activities of the Kings County Republican County Committee that involved "public electoral functions," id. at 314, in particular, those activities directly related to "the selection of party nominees," id. at 315. We specifically included nominations effected entirely by the committee members themselves, namely, "the nomination of candidates to fill vacancies or to run in special elections, or the giving of consent to candidacies [of] non-members of the party" because "in such cases [the committee] is unquestionably playing an integral part in the state scheme of public elections." Id. at 314; see also Ripon Soc'y v. Nat'l Republican Party, 525 F.2d 567, 586 (D.C.Cir.1975) (in banc) (noting in the context of nominating convention that "[i]f the right to vote is a right to true participation in the elective process, then it is heavily implicated in the nomination process").
 
 
 111
 In this case, the delegate primary election and subsequent nominating convention are State-created and legally required aspects of the process of public choice in New York. See N.Y. Elec. L. §§ 6-106, -124. Further, as a practical matter, the evidence established that the result of that nominating process profoundly affects the choice at the general election, a fact to which "we cannot close our eyes" because it means that exclusionary nominating-phase regulations may well "operate to deprive the voter of his constitutional right of choice." Classic, 313 U.S. at 319, 61 S.Ct. 1031; see also Terry, 345 U.S. at 469, 73 S.Ct. 809; Bullock, 405 U.S. at 146, 92 S.Ct. 849. Accordingly, both segments of the nominating procedure are integral parts of the State's election machinery, and therefore subject to the requirements and prohibitions of the First Amendment. Seergy, 459 F.2d at 313 (holding that constitutional protection attaches to nominating process regardless of whether voting occurs "directly [by voters] or indirectly through their committeemen").
 
 
 112
 2. The First Amendment Guarantees Voters and Candidates a Realistic Opportunity to Participate in the Nominating Phase Free From Severe and Unnecessary Burdens
 
 
 113
 Having concluded that New York must afford voters and candidates the right to associate through and in the judicial nominating process, we now examine the scope of that right. Defendants maintain that the First Amendment grants voters and candidates only the right to "access" the nominating process. The term "access" is vague, and the only definition that defendants advance to flesh it out is that a candidate must "have a chance to enter the judicial convention." At oral argument, defendants supplemented this definition by asserting that the Constitution prohibits only those regulations that exclude voters or candidates on the basis of race, sex, or some other categorical demarcation.
 
 
 114
 As we explain below, the First Amendment affords candidates and voters a realistic opportunity to participate in the nominating process, and to do so free from burdens that are both severe and unnecessary to further a compelling state interest. Further, while categorical race and sex-based exclusions undoubtedly violate the associational rights of voters and candidates, exclusions that result from a complex of otherwise facially valid regulations also may offend the First Amendment.
 
 
 115
 Although no case has passed on a scheme identical to New York's unique judicial election process, the above principles derive directly from a line of Supreme Court cases limiting a State's power to structure its elections and regulate access to its ballot. In Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), for example, the Court confronted an "entangling web of [Ohio] election laws" that "effectively foreclosed [the state's] presidential ballot to all but Republicans and Democrats." Id. at 35, 89 S.Ct. 5 (Douglas, J., concurring). The regulations required new parties to "erect elaborate political machinery," id. at 37, 89 S.Ct. 5, in order to collect an onerous amount of signatures from a restricted pool of signatories, elect a state central committee comprised of two members from every congressional district and county in the state, and elect a slate of delegates and alternates to the national convention. Id. at 25 n. 1, 89 S.Ct. 5. It was "virtually impossible" for a new party to satisfy those ballot access requirements. Id. at 24, 89 S.Ct. 5 (Black, J., for the Court). Given the severe burdens that the "totality of the . . . restrictive laws taken as a whole impose[d] on voting and associational rights," and the lack of a compelling state interest to justify them, the Court struck the scheme pursuant to the Equal Protection Clause of the Fourteenth Amendment. Id. at 34, 89 S.Ct. 5.
 
 
 116
 Similarly, in Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), the Court focused on the "patently exclusionary character" of the regulation to find a constitutional violation. Id. at 143, 92 S.Ct. 849. There, a Texas filing fee "in every practical sense precluded" all but affluent candidates "from seeking the nomination of their chosen party, no matter how qualified they might be, and no matter how broad or enthusiastic their popular support." Id. at 143, 92 S.Ct. 849. "The effect of this exclusionary mechanism on voters" was to "substantially limit[] . . . their choice of candidates." Id. at 144, 92 S.Ct. 849. In light of that "real and appreciable impact on the exercise of the franchise," the Court applied strict scrutiny, determined that the restrictions were not necessary to serve a compelling state interest, and struck them pursuant to the Equal Protection Clause of the Fourteenth Amendment. Id. at 144, 145-49, 92 S.Ct. 849.
 
 
 117
 Finally, in Anderson v. Celebrezze, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), the Court considered whether Ohio's early filing deadline violated the First Amendment rights of independent candidates and voters who wished to associate with them. The Court set forth that its "ballot access cases focus on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restrictions unfairly or unnecessarily burden the availability of political opportunity." Id. at 793, 103 S.Ct. 1564 (quoting Clements v. Fashing, 457 U.S. 957, 964, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982)) (alterations incorporated and internal quotation marks omitted). The deadline "totally exclude[d] any candidate who [made] the decision to run for President as an independent after . . . March" and also "burden[ed] the signature-gathering efforts of independents who decide[d] to run in time to meet the deadline." Id. at 792, 103 S.Ct. 1564. The Court again applied strict scrutiny, concluded that the regulations were not necessary to serve a compelling state interest, and struck them pursuant to both the First Amendment and Equal Protection Clause. Id. at 795, 806, 103 S.Ct. 1564.
 
 
 118
 These cases establish that the First Amendment prohibits a state from maintaining an electoral scheme that in practice excludes candidates, and thus voters, from participating in the electoral process, unless the exclusionary regulations are necessary to further a compelling state interest. See also Amer. Party of Tex. v. White, 415 U.S. 767, 783, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974) (noting that regulations "may not be so excessive or impractical as to be in reality a mere device to always, or almost always, exclude parties with significant support from the ballot"); Jenness v. Fortson, 403 U.S. 431, 438, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (noting that election laws may not "operate to freeze the political status quo" or "impose . . . the Procrustean requirement of establishing elaborate primary election machinery"). A corollary of that principle is that candidates and voters have the right to participate in, or associate through, the State's chosen electoral process free from burdens that are both severe and unnecessary to serve a compelling state interest. These cases further establish that a network of facially innocent provisions, instead of only categorical exclusions, may operate to infringe that right. See Williams, 393 U.S. at 34, 89 S.Ct. 5. With the proper scope of plaintiffs' rights so clarified, we next examine whether the District Court rested its decision on that right or on another, overly broad interpretation.
 
 
 119
 3. The District Court Recognized and Applied the Appropriate First Amendment Right
 
 
 120
 The District Court found that plaintiffs have the "right to . . . compete for their major party's nomination" free from burdens that are both severe and unnecessary. Lopez Torres v. N.Y. State Bd. of Elections, 411 F.Supp.2d 212, 245 (E.D.N.Y.2006) (emphasis added). Nowhere in its decision did the District Court hold that plaintiffs possessed a so-called right to win. We find no error in the District Court's statement of a right to "compete," although we believe our discussion above sets forth a more precise definition.
 
 
 121
 Regardless of semantic nuance, the factual findings on which the District Court based its conclusion illustrate that it applied the correct standard. As we explain in greater detail in the following portions of this opinion, those factual findings are not clearly erroneous. Those findings establish that candidates lacking party leaders' support and the voters who wish to associate with them are practically, if not formally, excluded from the nomination process. The District Court found that candidates "never" satisfy the signature and structural requirements necessary to get "their own slates of delegates on the ballot across the judicial district." Id. at 248. The District Court further found that the possibility of lobbying party-affiliated delegates for support was non-existent because delegates "without consultation or deliberation, rubber stamp the county leaders' choices." Id. at 223.
 
 
 122
 New York's nominating process, as found by the District Court, does not merely deprive a candidate of a realistic chance to prevail; rather, through the use of overlapping and severe burdens, it deprives a candidate of access altogether. The exclusion of candidates, in turn, severely and unnecessarily "limit[s] the field of candidates from which voters might choose," which is our ultimate and "primary concern" in assessing these restrictions. Anderson, 460 U.S. at 786, 103 S.Ct. 1564 (internal quotation marks omitted). Since the District Court's findings of fact establish the basic exclusionary character of the regulations, we are satisfied that the Court applied the correct First Amendment standard, as we described it above, in reaching its legal conclusions.
 
 
 123
 D. A Delegate-Based Nominating Convention System Is Not Per Se Constitutional
 
 
 124
 Defendants next contend that pursuant to Amer. Party of Tex. v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974), a nominating convention is per se constitutional. While we agree that a convention-based system is, in the abstract, a perfectly acceptable method of nomination, we reject defendants' claim that all such systems, regardless of how they are implemented, are constitutional.
 
 
 125
 The first flaw in defendants' argument is that it is counterfactual. New York's nominating process does not consist only of a convention. It also includes an open, albeit indirect, primary election—an electoral phase that defendants completely ignore. Yet the primary election—at which party-backed delegates are overwhelmingly "deemed elected"—is of central importance to the entire electoral process because it effectively dictates the result of the convention, which in turn greatly affects the result of the general election.
 
 
 126
 Second, as a legal matter, the subsequent convention does not per se render New York's hybrid scheme constitutional. We repeat that this area of the law admits of no bright-line rules. "Constitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any `litmus-paper test' that will separate valid from invalid restrictions." Anderson, 460 U.S. at 789, 103 S.Ct. 1564. Instead, "[d]ecision in this context, as in others, is very much a matter of degree." Storer, 415 U.S. at 730, 94 S.Ct. 1274 (internal quotation marks ommitted).
 
 
 127
 Consistent with that general characterization, White gave no categorical blessing to nominating conventions generally, or to the unique hybrid scheme at issue here. In White, the Court considered a First Amendment challenge to Texas election laws that provided four methods of nominating candidates to the general election ballot. 415 U.S. at 772-75, 94 S.Ct. 1296. Among these methods, the law gave medium-sized parties the option of holding a nominating convention, and required small parties to do so, while permitting major parties to hold primary elections. Id. Plaintiffs, a group of minor political parties and their candidates, asserted that this aspect of the scheme violated the Equal Protection Clause. Id. at 781-82, 94 S.Ct. 1296. The Court rejected plaintiffs' equal protection claim on the ground that compelling small parties to hold conventions instead of primary elections did not amount to invidious discrimination: "The procedures are different, but the Equal Protection Clause does not necessarily forbid one in the preference of another." Id. at 781-82, 94 S.Ct. 1296.
 
 
 128
 Defendants seek to expand White far beyond its holding by ignoring several crucial points. First, White does not even address the question of whether all convention-based systems are per se constitutional. See id. at 781, 122 S.Ct. 2528 ("It is too plain for argument, and it is not contested here, that the State ... may insist that intraparty competition be settled before the general election by primary election or by party convention." (emphasis added)). Second, the White Court did not end its analysis simply because Texas required conventions in certain instances. Instead, the Court reviewed the convention-based system under the normal mode of analysis set forth above. Id. at 781-93, 122 S.Ct. 2528. Further, the Court applied strict scrutiny, and the scheme passed that rigorous test. Id. at 780-81 & n. 11, 122 S.Ct. 2528; see also id. at 780, 122 S.Ct. 2528 ("[W]hether the qualifications for ballot position are viewed as substantial burdens on the right to associate or as discriminations against parties not polling 2% of the last election vote, their validity depends upon whether they are necessary to further compelling state interests." (citation omitted)).
 
 
 129
 Third, the White Court expressly contemplated that a convention-based system was a valid method to settle "intraparty competition." Id. at 780, 122 S.Ct. 2528 (emphasis added). Finally, the Court found that the burdens imposed by the scheme were not substantially greater for small parties, and that the scheme did not "on its face or as it operates in practice, impose[] insurmountable obstacles to fledgling political party efforts." Id. at 784, 122 S.Ct. 2528. In light of that finding, the Court concluded that the Texas scheme provided various acceptable methods to resolve competition among and within parties—not foreclose that competition, as the District Court found here. Accordingly, White posits no per se rule.
 
 
 130
 E. The Associational Rights of Political Parties Do Not Justify New York's Nominating Scheme
 
 
 131
 Defendants next maintain that within the context of New York's nominating procedure, the associational rights of a political party are so strong that they permit it to impose regulations, such as the delegate allocation formulae, that operate to lodge control over the nomination in the hands of party leadership. In support of this contention, defendants rely upon two cases in which courts balanced the associational rights of a party against those of its members, and concluded that the party's rights were weighty enough, and the infringement of their members' rights minor enough, to justify the restrictions the party had imposed. See Bachur v. Democratic National Party, 836 F.2d 837 (4th Cir. 1987); Ripon Soc'y v. Nat'l Republican Party, 525 F.2d 567 (D.C.Cir.1975) (in banc).
 
 
 132
 In Ripon Society v. National Republican Party, 525 F.2d 567 (D.C.Cir.1975) (in banc), plaintiffs challenged the National Republican Party's delegate allocation formula, which awarded delegates to a state based on (1) the number of electoral college votes that the state possessed; (2) whether the state voted Republican in the last presidential election; and (3) whether the state recently had elected a Republican governor or senator, or a Republican majority of its congressional delegation. Id. at 570-71. Plaintiffs claimed that because the latter two aspects of the formula awarded "victory bonuses," the formula "deviate[d] too far (in favor of less populous states) from proportionality to electoral college representation, to total population, and to the Republican vote in past elections." Id. at 572. This deviation, plaintiffs asserted, diluted their votes in violation of the Equal Protection Clause of the Fifth and Fourteenth Amendments: "Victory bonuses in general are said to violate the Constitution." Id. at 572-73.
 
 
 133
 In an opinion joined by only four of the 10 judges sitting in banc, the court noted that the First Amendment protects "a party's choice, as among various ways of governing itself, of the one which seems best calculated to strengthen the party and advance its interests." Id. at 585. The court also recognized that a party member's "right to true participation in the elective process" was "heavily implicated in the nomination process," but ultimately concluded that a party's right to associate was "more in need of protection in this case." Id. at 586. Thus, the court held "that the formula does not violate the Equal Protection Clause." Id. at 588. Accordingly, the Ripon plurality opinion stands for the proposition that a party may structure itself by adopting a delegate allocation formula that dilutes—to some degree—the votes of its rank-and-file members.
 
 
 134
 In Bachur v. Democratic National Party, 836 F.2d 837 (4th Cir.1987), the Fourth Circuit upheld a Democratic National Party Rule requiring that the sexes be equally represented among the State's delegation to the national convention. See id. at 838. Plaintiff claimed that the rule infringed his fundamental right to vote in national elections. Id. at 841. While the court recognized that Barchur's "right to vote" applied to delegate elections, it concluded that the "the private associational rights of the party to give shape to its goals through the equal protection of women at the national convention [did not] impermissibly limit Bachur's (and the candidates') participation in the primary process." Id. at 842. The court expressly noted that the purpose of the rule was to "broaden public participation in party affairs," id. at 843, and that, in any event, it was not fashioning any sort of controlling principle: "We do not foreclose the possibility of a different result with respect to a different restriction in a different case," id. at 841.
 
 
 135
 As these cases and others make clear, the First Amendment protects a political party's right to determine the structure and content of its own association. See, e.g., Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 216, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) (holding that a state may not prohibit parties from endorsing candidates in primary election or "dictate the [party's] organization and composition" except as necessary to serve a compelling state interest); Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 224, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) (noting that the First Amendment protects a party's "determination of the boundaries of its own association, and of the structure which best allows it to pursue its goals"); see also Clingman v. Beaver, 544 U.S. 581, 590, 125 S.Ct. 2029, 161 L.Ed.2d 920 (2005) (plurality) (finding that a law prohibiting a party from conducting an open primary did not burden the party's associational interests because it did not "regulate the [party's] internal processes, its authority to exclude unwanted members, or its capacity to communicate with the public").
 
 
 136
 For two reasons, however, we conclude that these associational rights do not outweigh the associational rights of qualified, party-member voters and candidates. First, the convention system considered in Ripon was, by and large, a private function that directly implicated the party's right to govern its own internal affairs. See Ripon, 525 F.2d at 584 (noting that delegates are selected through a process that is "virtually (or even officially) [one] of appointment by party officials"); see also id. at 584 n. 55 (observing that "over 600 delegates to the 1968 Convention were selected by processes which have included no means of voter participation since 1966") (internal quotation marks omitted). By contrast, New York's delegate selection process is one of public election, see N.Y. Elec. L. §§ 6-106, -124, which directly implicates the associational rights of party-members voters and candidates. See generally Eu, 489 U.S. at 226 n. 15, 109 S.Ct. 1013 (noting the existence of "the independent First Amendment rights of the parties' members"); Calif. Democratic Party v. Jones, 530 U.S. 567, 573 n. 4, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000) (noting that "the constitutional rights of those composing the party cannot be disregarded"). Indeed, judicial delegates hold no party leadership position and exercise no party authority other than to act, in the ideal, as conscientious proxies for the communities that elected them. See Seergy v. Kings County Republican County Committee, 459 F.2d 308, 314-15 (2d Cir.1972) (concluding that "the selection of party nominees" by committee members is a "public electoral function"). We further note that the nomination stage of judicial elections "effectively controls the choice" at the general election—a choice that the state constitution commits to the public—and thus implicates voters' and candidates' rights on this basis as well. United States v. Classic, 313 U.S. 299, 318, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); cf. Ripon, 525 F.2d at 589 (noting that court's conclusion "might be otherwise ... where a vote in the nominating process is the only effective vote that can be cast").
 
 
 137
 Second, the regulations at issue here affect the First Amendment rights of party members much more severely than did those in Ripon and Bachur. In Ripon, the regulations merely diluted the votes of some party members residing in those states that did not reap the awards of the victory bonus system. Here, the evidence showed that the political parties' delegate allocation formulae do much more than merely dilute the proportional efficacy of votes vis a vis assembly districts within a judicial district. Rather, the evidence showed that a network of restrictive regulations effectively excludes qualified candidates and voters from participating in the primary election and subsequent convention, and thus severely limits voter choice at the general election.
 
 
 138
 Nor did Bachur address a claim of this ilk. In that case, there existed no entry barriers to candidates. Nor did the regulations effectively prevent a party member from voting for their preferred candidate; they merely required that a party member allocate her delegate vote equally on the basis of sex. Id. at 841 ("Barchur does not claim that he was foreclosed from voting for the candidate of his choice. . . .").
 
 
 139
 In light of the highly public nature of the judicial nominating process and the exclusionary impact of the regulations on the party's own membership, the parties' associational interest is not so strong as to justify the current scheme. Indeed, under these circumstances it is difficult for us to conceive of any party interest that is weighty enough to justify excluding qualified party members from competing for the position of delegate or judicial nominee, or from associating with party-member candidates seeking those offices.
 
 
 140
 In reaching this conclusion, we note that in all events, political parties remain free to publicly endorse and support a candidate of their own choosing. See Eu, 489 U.S. at 223, 109 S.Ct. 1013. What New York state and its political parties may not do is exclude from the nominating process qualified party-member candidates and voters who wish to support them. Such a limitation on the parties' associational activity is modest, to be sure, and neither encroaches on matters of internal governance, curtails the party's ability to communicate with the public, nor risks "saddl[ing a party] with an unwanted, and possibly antithetical, nominee." Jones, 530 U.S. at 579, 120 S.Ct. 2402.
 
 
 141
 F. The Existence of an Alternate Means of Access to the General Election Ballot Does Not Automatically Render Constitutional New York's Regulation of the Primary Election Ballot and Nominating Convention
 
 
 142
 Defendants claim that because a candidate may access the general election ballot as an independent candidate, see N.Y. Elec. Law §§ 6-138, -142(2), or write-in candidate, see N.Y. Elec. Law §§ 7-104(7), -106(8), the provisions regulating access to the primary ballot and nominating convention are "a fortiori" constitutional. (Blue 41-45) However, the Supreme Court already has rejected that argument.
 
 
 143
 In Bullock v. Carter, 405 U.S. 134, 146-47, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), the Court considered the constitutionality of a filing fee that Texas charged candidates who wished to access the primary election ballot. The State maintained that the filing fee was constitutional because "a candidate can gain a place on the ballot in the general election without payment of fees by submitting a proper application accompanied by a voter petition." Id. at 146, 92 S.Ct. 849. In rejecting the State's argument, the Court noted two critical facts: first, the political reality in Texas was that the primary election was the "crucial" stage of the electoral process, and second, that in order to avoid the primary-phase restrictions, a candidate had to forego the primary altogether and abandon his political affiliation for a general election ballot position. Id. at 146-47, 92 S.Ct. 849 ("Apart from the fact that the primary election may be more crucial than the general election in certain parts of Texas, we can hardly accept as reasonable an alternative that requires candidates and voters to abandon their party affiliations in order to avoid the burdens of the filing fees imposed by state law." (footnote omitted)); cf. Storer v. Brown, 415 U.S. 724, 745, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) ("But the political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other."). The same two critical facts are present here. Accordingly, the existence of a reasonable alternative means of access to the general election ballot for independent or write-in candidates does not correct otherwise unconstitutional restrictions operating at the party nomination phase.
 
 
 144
 None of the cases that defendants cite contradicts this principle. In LaRouche v. Kezer, 990 F.2d 36 (2d Cir.1993), we held that the existence of a reasonable means of ballot access may render constitutional an alternative means of access that, standing alone, might not be constitutional. However, in LaRouche, the two means of ballot access concerned the same point in the electoral process—the primary—and each allowed the candidate to express his political affiliation. Id. at 37-38. LaRouche stands only for the principle that where an adequate means of ballot access exists, the addition of another means of access to the same ballot only increases access and thus is constitutional unless it is wholly irrational. Likewise, in Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), the Court upheld a Georgia law that provided two alternative means of access to the same electoral phase—the general election ballot. Further, each of the two means of access was constitutional when considered independently. Id. at 432-44, 91 S.Ct. 1970.
 
 
 145
 Nor may defendants find support in Burdick v. Takushi, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). In Burdick, the state of Hawaii provided three alternative routes of access to the primary election ballot, but did not permit write-in voting. See id. at 435-36, 112 S.Ct. 2059. Petitioner was a voter who claimed that the First Amendment compelled Hawaii to allow him to cast, and to count, a write-in "protest vote for Donald Duck," even though Donald Duck unsurprisingly failed to file nominating papers. Id. at 438, 112 S.Ct. 2059 (internal quotation marks omitted). Like the other cases discussed above, Burdick concerned alternative routes of access to the same electoral phase—the primary election. The Court considered all three methods of access to that phase, found that they "provide[d] easy access to the ballot," id. at 436, 112 S.Ct. 2059, and thus concluded that "Hawaii's prohibition on write-in voting" comported with the First and Fourteenth Amendments, id. at 441-42, 112 S.Ct. 2059.
 
 
 146
 Likewise, Storer v. Brown, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), did not turn on an alternative means of access to the general election ballot. There, the Court had "no hesitation in sustaining" California's one-year disaffiliation requirement for independent candidates. Id. at 733, 94 S.Ct. 1274. The Court then remarked—in a footnote—that "[m]oreover, . . . the independent candidate who cannot qualify for the ballot may nevertheless resort to the write-in alternative provided by California law." Id. at 736 n. 7, 94 S.Ct. 1274. Thus, Storer illustrates only that similar disaffiliation requirements are constitutional—not that general election write-in options cure constitutional defects in the nominating stage.
 
 
 147
 Finally, Munro v. Socialist Workers Party, 479 U.S. 189, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986), concerned a law that required minor-party candidates to (1) be nominated by convention and (2) "as a precondition to general ballot access ... appear on the primary election ballot and receive at least 1% of all votes cast for that particular office." Id. at 191, 107 S.Ct. 533. The Court found this provision constitutional on its own—not because of any alternate means of ballot access—pursuant to the "clear" principle "that States may condition access to the general election ballot ... upon a showing of a modicum of support." Id. at 193, 107 S.Ct. 533.
 
 
 148
 Accordingly, the District Court correctly concluded that the existence of a reasonable means of general election ballot access for independent or write-in candidates does not "a fortiori" render constitutional New York's regulation of access to the primary election ballot and subsequent nominating convention.
 
 
 149
 G. The Burdens Imposed by N.Y. Elec. L. §§ 6-106, -124 Are Severe
 
 
 150
 Defendants claim that the District Court incorrectly concluded that New York imposes severe burdens on candidates and voters seeking to participate in the nominating phase of Supreme Court elections. Specifically, defendants challenge three of the District Court's underlying factual findings: (1) challenger candidates never are successful; (2) the petitioning requirements to run a slate of delegates in the primary election are unduly burdensome; and (3) delegates merely do the bidding of party leadership. Defendants claim that each of these three factual findings is subject to de novo review as a mixed question of fact and law, and that even if clear error review applies, the findings are clearly erroneous.
 
 
 151
 The clear error standard applies both to the District Court's ultimate finding of severity as well as the findings underlying that determination. See Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 501, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (noting that "Rule 52(a) applies to findings of fact, including those described as ultimate facts." (internal quotation marks omitted)); Green Party of New York State v. N.Y. State Bd. of Elections, 389 F.3d 411, 418-21 (2d Cir.2004) (reviewing for clear error the district court's factual findings as to whether the regulation imposed severe burdens on voter's First and Fourteenth Amendment rights); cf. Goosby v. Town Bd. of Town of Hempstead, 180 F.3d 476, 492 (2d Cir. 1999) (applying clear error standard to finding of vote dilution under the Voting Rights Act). However, because the District Court's ruling implicates the First Amendment rights of political parties, in assessing whether the District Court clearly erred we are obliged to make an "independent examination of the whole record" to assure ourselves that the "judgment does not constitute a forbidden intrusion on the field of free expression." Bose Corp., 466 U.S. at 499, 104 S.Ct. 1949 (noting that the "conflict between the two rules is in some respects more apparent than real"). As set forth more fully below, we ultimately conclude that in light of all the evidence presented in this case, we cannot say that the District Court clearly erred in finding that New York's judicial nominating scheme imposes severe burdens on the associational rights of voters and candidates.
 
 
 152
 1. The District Court Properly Assessed the Burdens from the Standpoint of a Reasonably Diligent Candidate Who Lacks the Support of Party Leadership
 
 
 153
 In assessing the severity of the burdens at issue, the District Court adopted the perspective of "a reasonably diligent candidate who lacks the support of a massive apparatus controlled by the party leadership." Lopez Torres, 411 F.Supp.2d at 244 (alterations incorporated and internal quotation marks omitted). Defendants claim that the District Court adopted a "flawed" challenger candidate paradigm, but offer no legal support for this argument. Specifically, defendants contend that this definition is "circular" because as soon as a candidate succeeds, she attains party support and ceases to be a "challenger"; that is, by the District Court's definition, challenger candidates always will fail. We disagree.
 
 
 154
 First, the District Court's definition is not circular. A challenger candidate simply is one who lacks the party's machinery—not popular support from the party's rank-and-file—and has no other means of making herself available to the voters during integral electoral phases. To illustrate, when Lopez Torres was an incumbent Democratic office holder seeking a Supreme Court nomination, she had significant public support, but could not access the electoral process without possessing either great wealth or a massive preexisting political apparatus.
 
 
 155
 Second, the District Court's definition derives directly from applicable case law. In Storer, the Supreme Court described "the inevitable question for judgment" as follows: "in the context of California politics, could a reasonably diligent independent candidate be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot?" 415 U.S. at 742, 94 S.Ct. 1274. Consistent with Storer, the District Court viewed the burdens at issue here from the perspective of a reasonably diligent candidate who, although possessing public support, lacks the resources provided by a supportive political party and has no other means of overcoming the burdens that the system imposes.
 
 
 156
 Defendants point out that Storer concerned a minor-party candidate competing against a major-party candidate, whereas this case concerns intraparty competition. For the purposes of our analysis, we find this distinction immaterial. Minor-party candidates and disfavored major-party candidates face closely similar challenges in this context: both are opposing an entrenched, dominant, and hostile political apparatus. Further, candidates such as Lopez Torres are in an arguably worse position since they lack the support of even a minor party. Given these realities, we previously have recognized that the burdens imposed by New York's petitioning rules are increased where a candidate lacks the support of her party's leadership. See Lerman v. Bd. of Elections in the City of New York, 232 F.3d 135, 147 (2d Cir. 2000) ("While candidates who are well-financed or favored by their party's leadership might have ready access to the resources necessary to ensure that they qualify for the ballot, many candidates—especially those challenging their party's leadership—do not."). Thus, the District Court correctly adopted the perspective of a candidate who has at least some measure of popular support but lacks the support of party leadership, and has no other means of overcoming the burdens imposed by the electoral scheme.
 
 
 157
 2. New York's Judicial Election Process Severely Burdens the Associational Rights of Voters and Candidates
 
 
 158
 Defendants claim that the District Court erred in finding that the structure of the primary election, its petitioning requirements, and the delegate lobbying process severely burden First Amendment associational rights. We disagree.
 
 
 159
 Defendants first claim that the District Court relied too heavily on Rockefeller v. Powers, 917 F.Supp. 155 (E.D.N.Y.1996), aff'd, 78 F.3d 44 (2d Cir.1996), in concluding that the petition signature requirements for running a slate of delegates severely burden a judicial candidate's ability to access the primary election stage of the electoral process. In particular, defendants contend that since we subsequently limited Rockefeller to "the special circumstances of that case," it was error for the District Court to rely upon it. See Prestia v. O'Connor, 178 F.3d 86, 87 (2d Cir.1999) (per curiam).
 
 
 160
 However, the District Court did not err by drawing an analogy to Rockefeller, even though that case is limited, it remains applicable in similar factual circumstances. See, e.g., Lerman, 232 F.3d at 152 (relying on Rockefeller). More importantly, other applicable case law and the record evidence wholly support the District Court's conclusion. In Lerman, 232 F.3d 135, we held unconstitutional a statute that required a petition signature witness to live within the district that the candidate was seeking to represent. We took account of a resource disparity between well-equipped candidates "who are ... favored by their party's leadership" and other candidates lacking resources, "especially those challenging their party's leadership." Id. at 147. We also noted that "as a practical matter a candidate seeking election needs a surplus of signatures because they likely will be challenged on a number of grounds." Id. (internal quotation marks omitted). Finally, we recognized that the prohibition on a voter signing more than one petition caused a candidate to "face a shrinking pool of potential signatories" as other candidates sought out signatures. Id. at 148 (internal quotation marks omitted). Based on those considerations, we invalidated the witness residency requirements, even though the candidate at issue in Lerman needed to gather only 38 signatures. Id. at 139.
 
 
 161
 Conditions similar to those in Lerman and Powers exist here. As in Powers, judicial candidates must gather many signatures across a number of assembly districts. See Powers, 78 F.3d at 46. In order to participate in the primary election by running a slate of delegates, a judicial candidate must gather at least 9,000 signatures and as many as 24,000 within a 37-day petition circulating period. In approaching this difficult task, candidates cannot rely on a few areas of strength: they must gather signatures equally from all the assembly districts within the judicial district, of which there are at least 9 and as many as 24.
 
 
 162
 Moreover, as in Lerman and Powers, candidates must gather a surplus of signatures—between 1,000 and 1,500 signatures per assembly district—to beat back challenges, and candidates face a shrinking pool of signatories once party members begin to sign the petitions of candidates backed by the party leadership. Further, as the evidence established, candidates lacking the support of party leadership face a large disparity in resources when competing against those favored by the party leadership.
 
 
 163
 Judicial candidates also must recruit a large number of individuals to act on their behalf. Candidates must recruit between 32 and 124 individuals to run as delegates, not including alternates. Moreover, they must recruit another group of individuals to circulate petitions in each assembly district. Finally, judicial candidates must educate voters in each assembly district as to the delegates with whom they are affiliated, since that information does not appear on the ballot.
 
 
 164
 These burdens, taken together, thrust upon judicial candidates "the Procrustean requirement of establishing elaborate primary election machinery." See Jenness v. Fortson, 403 U.S. 431, 438, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971). It is "virtually impossible"—and perhaps absolutely impossible—for a candidate to satisfy this "series of election laws." See Williams v. Rhodes, 393 U.S. 23, 24, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). Defendants' own expert, Kellner, admitted as much. Despite the purportedly open nature of the process, he testified that "the idea that an individual candidate would go out and recruit delegates candidates and run delegates pledged to that candidate in the primary is not the system and it twists the design of the system on its head." Indeed, over a four-year period, almost 90 percent of all delegate races in four judicial districts—including what is perhaps the State's most competitive district—went uncontested, meaning that nearly nine out of 10 delegates were "deemed elected" without ever appearing on the ballot. In four counties—Albany, Nassau, Suffolk, and Tompkins—there was not one single contested delegate race. These statistics starkly illustrate that the structure of the primary election and the petition signature regulations are "patently exclusionary" with respect to candidates and ultimately voters, who hardly ever receive the opportunity to cast a vote in a delegate race. See Bullock v. Carter, 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). The District Court properly found these burdens severe.
 
 
 165
 In further concluding that the process of lobbying delegates imposes severe, exclusionary burdens on candidates and voters, the District Court relied on three findings: (1) county leaders select their party's nominees; (2) delegates merely endorse those choices; and (3) delegates do not require express commands to do so. Defendants attack each of these factual predicates.
 
 
 166
 Defendants first claim that "overwhelming evidence showed that party leaders throw their support behind a candidate only after it becomes clear that the candidate has achieved widespread support among delegates." Defendants cite testimony to that effect from two of their own witnesses, Kellner and Arthur Schiff. In addition, they note that Farrell described the process as "almost like picking the winner of a horse race after the race." They also claim that Carroll, a former judicial delegate who testified for plaintiffs, admitted that several "insurgent candidates" have won the Democratic nomination in the Second Judicial District, and that district leaders have no control over how delegates associated with his political club cast their votes.
 
 
 167
 However, the cited portions of Carroll's testimony cannot bear defendants' interpretation. Carroll merely testified that some judges, including former Assemblymember Michael Pesce, came out of a so-called "reform" political club. He never asserted that they overcame the opposition of the party's leadership. Moreover, he testified only that the county party does not control whom his reform club supports—an issue that does not concern the county leader's control over delegates generally. Further, Kellner, Schiff, and Farrell gave testimony contradicting their claim that county leaders merely hop a bandwagon driven by independent-minded delegates.
 
 
 168
 Defendants ignore that testimony and copious additional evidence supporting the District Court's finding that party leaders designate judicial nominees. That evidence included, inter alia, the following: (1) Kellner's testimony that, "By definition, the convention system is designed so that the political leadership of the party is going to designate the party's candidates"; (2) Farrell's claim that he "surely" can "kill" any nomination and that delegates do not "want[] to get me angry, so they will not go against me until they have nothing to lose"; (3) Schiff's inability to cite one single instance of a candidate receiving a nomination over Farrell's objection; (4) the testimony of Judge López Torres and a former lower court judge that delegates do not consider candidates not supported by the county leaders; (5) Berger's testimony that "district leaders almost always follow the wishes of the county party chairperson when it comes to voting for Supreme Court candidates at the convention," and that in turn "delegates follow the wishes of the district leaders"; (6) Berger's testimony that in the Second and Twelfth Judicial Districts, party officials told him the names of the judicial nominees even before the delegates were elected; and (7) the reports of the Commission to Promote Public Confidence in Judicial Elections, the Fund for Modern Courts, and the Task Force on Judicial Diversity, all of which concluded in various forms "that across the state, the system for selecting candidates for the Supreme Court vests almost total control in the hands of local political leaders." In light of all that evidence, as well as more proof too repetitious to set forth again, we cannot say that the District Court clearly erred in concluding that party leaders designate nominees instead of merely reacting to the choice of delegates.
 
 
 169
 In similar vein, defendants next claim that the "overwhelming weight of evidence elicited at the hearing was that judicial delegates are independent." In support of this contention, defendants point out that no delegate testified to receiving express instructions on how to vote. However, as the District Court concluded, the evidence established that such instructions were not necessary.
 
 
 170
 Kellner testified that at least in some judicial districts, the "leadership of the party ... hold[s] a meeting before the convention" to "work things out" and the leadership then makes nomination "recommendations," which, Kellner agreed, "are always followed." Defendants' other expert averred that "[i]n virtually all cases . . . the delegates support the candidates supported by the district leader." Carroll testified that delegates are "told" by party leaders "this is the slate we're supporting at the convention" and then "that delegation support[s] that slate," even though the party leadership did not expressly threaten the delegation or state how it shall vote. As Farrell testified, no one wants to upset the county leader. Even absent an express command, contradicting the party's leadership, a former lower court judge set forth, would jeopardize one's political future. Schiff agreed that "[i]t makes no sense to alienate the [county leader] over a choice of Supreme Court candidate" because "three years down the line when we were seeking something from the county leader ... he might remember that I didn't support him at a different time." Finally, State Senator Connor's actions at the 2002 convention further illustrated that express commands are not needed to control delegates' votes.
 
 
 171
 Defendants also assert that the District Court ignored evidence that delegate slates are typically run by district leaders, not county leaders, and that the delegate election process is "open and vigorously contested." The District Court did not ignore the role that district leaders play in the nominating process. Instead, as Berger testified, the Court concluded that delegates generally follow the wishes of their local district leader, and district leaders, in turn, generally follow the wishes of their county leader. This dynamic is unsurprising considering that district leaders often are members of a county committee chaired by the county leader. Kellner's testimony supports this view: "By definition, the convention system is designed [so] that the political leadership of the party is going to designate the party's candidates. Specifically, judicial delegates are part of the party leadership and responsive to it and make it up, you know, constitute the party leadership." Further, we find it remarkable that defendants would describe the delegate election process as "open and vigorously contested" when over a four-year period in several judicial districts, almost 90 percent of delegates were "deemed elected" due to lack of opposition, including those within the allegedly competitive First Judicial District.
 
 
 172
 Defendants point to the testimony of several Supreme Court Justices that the nominating process, as they encountered it, was a fluid political environment in which they successfully lobbied open-minded delegates. Justice Joseph Sise of the Fourth Judicial District, for example, testified that he campaigned extensively, mailed literature, employed radio advertising, and attended "all nine of the 4th Judicial District's county fairs." Through these efforts, he allegedly convinced local residents, district leaders, delegates, and county leaders to support him.
 
 
 173
 The District Court discredited this version of events. In the Court's view, Sise began as a party favorite—after all, his own brother was the county leader of the judicial district's second largest county. He received the support of another county leader very early in the process, and shortly after that he met with the judicial district's other nine county leaders. When he received the nomination at the convention—unopposed—he thanked the 11 county leaders, among others.
 
 
 174
 The District Court reached a similar conclusion with respect to the candidacies of five other Justices that defendants offered as products of an open, competitive process. Concerning Justice Phyllis Gangel-Jacob, the Court determined that the Democratic Party in the First Judicial District, and in particular Farrell, supported her candidacy in part because her husband was a district leader. For the same reason, the Court concluded that the county party and Farrell supported the 1999 candidacy of Justice Alice Schlesinger. Likewise, the Court concluded that although Justice Helen Freedman lobbied delegates in a required, "ritualistic" fashion, Farrell and the county party supported her candidacy and secured her nomination. As for Justice Sheila Abdus-Salaam's testimony, the Court concluded that although she believed that she rose to the bench on a "grass roots groundswell," there were insufficient facts in the record to make a determination one way or the other. In any event, she admitted that Farrell ultimately supported her 1993 candidacy. Finally, with respect to the Eighth Judicial District, the Court determined that Justice Robert Lunn obtained the nomination not by appealing to voters and delegates, but rather to the Conservative Party's dominant county leader.[7] Nothing in the record leads us to different conclusions.
 
 
 175
 Finally, defendants urge that because López Torres received 25 votes at the 2002 convention, the District Court erred in finding that delegates are not independent. However, López Torres' testimony established that the county leader prevented her from competing at several conventions, and that despite her widespread popular support, she received virtually no consideration from the delegates in attendance. In light of the evidence recounted above, we cannot say that the District Court clearly erred in determining that judicial delegates merely endorse the choices of party leadership.
 
 
 176
 All of the evidence presented, and accepted by the District Court, reduces to this bottom line: through a byzantine and onerous network of nominating phase regulations employed in areas of one-party rule, New York has transformed a de jure election into a de facto appointment. "[I]n every practical sense," these regulations preclude all but candidates favored by party leadership "from seeking the nomination of their chosen party, no matter how qualified they might be, and no matter how broad or enthusiastic their popular support." Bullock, 405 U.S. at 143-44, 92 S.Ct. 849. "The effect of this exclusionary mechanism on voters" is to "substantially limit[] ... their choice of candidates." Id. at 144, 92 S.Ct. 849. Under these circumstances, the District Court properly concluded that New York's judicial nominating process severely burdens the associational rights of candidates and voters alike.
 
 
 177
 H. The District Court Properly Concluded that New York's Electoral Scheme Is Not Narrowly Tailored to Further A Compelling State Interest
 
 
 178
 Defendants advance six compelling state interests: (1) protecting a political party's associational right to choose its own nominee; (2) preventing party raiding; (3) protecting the associational rights of political parties to create geographically and racially balanced slates of nominees; (4) promoting racial and ethnic diversity on the state bench; (5) promoting geographic diversity on the state bench; and (6) promoting judicial independence by "protecting incumbents and otherwise ameliorating the ill effects of political campaigning on the judiciary."[8]
 
 
 179
 With respect to protecting a political party's right to associate with a candidate of its own choosing, we already have rejected the notion that, under New York's constitutional and statutory scheme, a party has the right to exclude its own members from the nominating phase. See Republican Party of Minn. v. White, 536 U.S. 765, 788, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) ("The greater power to dispense with elections altogether does not include the lesser power to conduct elections [in violation of the First Amendment].") (internal quotation marks omitted and alterations incorporated). Specifically, in Part I.E., we concluded that the First Amendment rights of a political party—i.e., party leadership—do not exist in a vacuum; instead, those rights must be balanced against the First Amendment rights of the party's rank-and-file members. Supra, at 190-93. Accordingly, we decline to recognize a compelling state interest in allowing political parties to exclude their own members from the nominating component of the state-run elective process at issue here.
 
 
 180
 Nonetheless, under New York's scheme, parties do retain the right to select a preferred candidate and advocate on her behalf, and we agree that protecting those rights is a compelling state interest. See, e.g., Eu, 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271. In this case, the current scheme is not narrowly tailored to achieve that end because there exist several less onerous means by which a state may secure the party's right to guide its own association in this fashion. First of all, New York State could allow parties to associate with their favored candidates by permitting parties to finance those candidates, directly and indirectly, at the nominating stage—a practice that is illegal under the current statutory scheme. See N.Y. Elec. L. § 2-126 (providing that parties may not expend funds "in aid of the designation or nomination of any person"); but see Avella v. Batt, ___ A.D.2d ___, 820 N.Y.S.2d 332, 333 (3d Dep't 2006) (holding that N.Y. Elec. L. § 2-126 "unconstitutionally burdens ... First Amendment rights" as applied to a party supporting a cross-endorsed candidate running in another party's primary); Kermani v. N.Y. State Bd. of Elections, No. 06 Cv. 0589, 2006 WL 2190716 (N.D.N.Y. July 31, 2006) (preliminarily enjoining N.Y. Elec. L. § 2-126, on First Amendment grounds, as applied to a party wishing to finance candidate running in its own primary election). Moreover, as we have noted, a party may recruit its own candidates and publicly endorse them, and it may speak out against candidates it disfavors. In short, New York's political parties possess such large financial and institutional advantages over any given challenger that they hardly need to exclude qualified candidates and voters in order to shape the course of their association.
 
 
 181
 The next state interest that defendants proffer—guarding against party raiding[9]—is compelling in its own right. See Clingman v. Beaver, 544 U.S. 581, 596, 125 S.Ct. 2029, 161 L.Ed.2d 920 (2005); cf. Cal. Democratic Party v. Jones, 530 U.S. 567, 577, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000) (holding that state may not compel political parties to allow non-members to vote in primary elections). Defendants urge that the current scheme "thwarts party raiding by funneling the nominating process through smaller groups of delegates who are intimately familiar with the qualifications of judicial candidates seeking the party's nomination."
 
 
 182
 Even assuming that party raiding actually is a problem in New York State's judicial elections—and the record does not establish that it is—and assuming further that the current scheme thwarts it, there are less onerous ways to prevent the practice. Defendants have failed to show that the electoral system, in its current form, is necessary to prevent the party raiding they fear. See Bullock, 405 U.S. at 147, 92 S.Ct. 849 ("But under the standard of review we consider applicable to this case, there must be a showing of necessity."). New York could adopt a one-year affiliation requirement, thus preventing another party's members from voting in a judicial primary. New York also could extend its Wilson-Pakula law to judicial elections, thus preventing one party's members from seeking the nomination of another party without the consent of the second party's leadership. See N.Y. Elec. L. § 6-120.
 
 
 183
 Defendants claim two types of interests in promoting geographic and racial diversity: a party's associational interest in creating racially and geographically balanced slates of nominees[10] and the state's interest in creating a racially and geographically balanced bench. As an initial matter, we note some skepticism as to whether the current scheme effectively serves those interests. A survey of the composition of the state's bench at the time this suit was filed suggests that over the course of 85 years the nominating process has, to put it mildly, failed to fully effectuate the state's goals as to geographic and racial diversity.
 
 
 184
 At the time plaintiffs filed this litigation, five judicial districts—almost half the state's total—had no minority Justices, even though minorities make up between 7.4 percent and 27 percent of the voting age population in those judicial districts.[11] Judicial districts that do have at least one minority Justice nonetheless reflect wide disparities in the number of minority Justices compared to the percentage of voting age population that minorities comprise. For example, in the Tenth Judicial District, minorities comprise 21.8 percent of the voting age population but only 4.3 percent of the Justices; in the Twelfth Judicial District, minorities comprise 82.3 percent of the voting age population but only 41.78 percent of the Justices.
 
 
 185
 Similar disparities exist as to geography. In the Seventh Judicial District, Monroe County is home to only 59 percent of the voters but boasts 19 out of 22 Justices. In the Second Judicial District, Staten Island has 17 percent of the registered voters but only half that proportion of Justices. Likewise, in the Eighth Judicial District, Erie County is home to 61 percent of registered voters but 89 percent of the Justices.[12]
 
 
 186
 These striking statistics are not dispositive of the issue. We cannot be certain precisely how well or poorly the current scheme promotes the State's ends because, given that this system has existed since 1921, we have no sound basis for comparison; it is perhaps possible that, absent the current scheme, the situation, poor as it is now, would be worse. However, the burden of demonstrating that the current scheme reasonably serves the asserted interests falls on defendants, see Lerman v. Bd. of Elections in the City of New York, 232 F.3d 135, 149 (2d Cir.2000) (noting that "the fact that the defendants' asserted interests are `important in the abstract' does not necessarily mean that its chosen means of regulation `will in fact advance those interests'"), and it is not clear that defendants have met that burden.
 
 
 187
 Setting these empirical doubts to one side, we rest our conclusion on the ground relied upon by the District Court: less burdensome means exist to promote racial and geographic diversity with respect to slates of nominees and sitting judges. New York could redraw judicial districts to provide for majority-minority districts, for county-specific districts, or for districts that more closely reflect some combination of geographic and racial constituencies. N.Y. Const. art. VI, § 6(b). New York also could require that Justices live in the districts in which they sit, so that the Justices of a judicial district truly represent its racial, ethnic, and geographic constituency.
 
 
 188
 Finally, with respect to promoting judicial independence, the Supreme Court has recognized only a limited sort of compelling state interest: preventing actual or apparent "bias for or against either party to the proceeding," i.e., actual litigants before the court. Republican Party of Minn. v. White, 536 U.S. 765, 775, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) (emphasis in original). In the first place, we do not see how the current system serves the goal of preventing this sort of bias better than any other system. Further, less burdensome means exist to serve that end. To the extent that fundraising may implicate bias, New York could provide for public campaign financing. New York also could require that judges be disqualified from cases in which one party has contributed substantially to the judge's campaign. Further, New York could pass a narrowly tailored law preventing a judicial candidate from campaigning based on her views "for or against particular parties." Id. at 776, 122 S.Ct. 2528.
 
 
 189
 Accordingly, for the reasons set forth above, the District Court properly concluded that New York's judicial nominating process is not necessary to further a compelling state interest, and therefore that plaintiffs demonstrated a clear likelihood of success on their First Amendment claim.
 
 
 190
 II. The District Court Was Not Required to Provide Notice Pursuant to Fed.R.Civ.P. 65(a)(2)
 
 
 191
 Defendants claim that the District Court "erred by failing to place Defendants on notice that it would effectively grant final relief to Plaintiffs without ordering that the preliminary injunction hearing be consolidated with a full trial on the merits." This argument borders on the frivolous. Rule 65(a)(2)'s notice provision applies only when the District Court orders a full trial on the merits and enters final judgment. See, e.g., Woe v. Cuomo, 801 F.2d 627, 629 (2d Cir.1986). The District Court did neither in this case—in fact, the Court expressly contemplated a full trial at a later date. See López Torres v. N.Y. State Bd. of Elections, 411 F.Supp.2d 212, 233, 240 (E.D.N.Y.2006).
 
 
 192
 Defendants claim that the District Court "effectively" awarded final relief and "effectively" held a full trial on the merits, but these arguments are totally unsubstantiated. We consistently have recognized that a preliminary order may award substantially all the relief sought. See, e.g., Tom Doherty Assoc., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34-35 (2d Cir.1995). Moreover, at oral argument defendants could not offer one example of how the District Court's procedure prevented them from offering a single piece of evidence or otherwise hindered the presentation of their case. Accordingly, the District Court did not err in failing to give notice pursuant to Rule 65(a)(2).
 
 
 193
 III. The District Court Did Not Exceed Its Allowable Discretion in Ordering that Judicial Nominations Proceed Via Primary Election Until the Legislature Enacts Corrective Legislation
 
 A. General Remedial Principles
 
 194
 "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). Indeed, "[i]n shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow. Moreover, in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable." Lemon v. Kurtzman, 411 U.S. 192, 200, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973) (citation and footnote omitted).
 
 
 195
 The Supreme Court recently set forth "[t]hree interrelated principles [that] inform our approach to remedies." Ayotte v. Planned Parenthood of N. New England, ___ U.S. ___, ___, 126 S.Ct. 961, 967, 163 L.Ed.2d 812 (2006). First, a district court must not "nullify more of a legislature's work than is necessary" to remedy the violation. Id. Second, the court must "restrain [itself] from rewriting state law to conform it to constitutional requirements." Id. at 968 (internal quotation marks omitted and alterations incorporated). A court must scrupulously observe that limitation when operating "in a murky constitutional context, or where line-drawing is inherently complex," because failure to do so would entail a "serious invasion of the legislative domain." Id. (internal quotation marks omitted). Third, "the touchstone for any decision about remedy is legislative intent." Id. We now apply these principles to the facts at hand.
 
 
 196
 B. The District Court Acted Within Its Discretion in Crafting a Remedy
 
 
 197
 Four aspects of the District Court's interim remedy are relevant to our review. First, having found New York's judicial nominating process violative of the First Amendment, the District Court fully enjoined the two statutory provisions that provide for that scheme. See N.Y. Elec. L. §§ 6-106, -124. Second, the District Court recognized that the choice of a permanent remedy rests exclusively with the State Legislature. Third, the Court declined to leave the State entirely without a judicial nominating process until the Legislature takes corrective action. Accordingly, relying on New York's default election provision—which provides that "[a]ll other party nominations of candidates for offices to be filled at a general election, except as provided for herein, shall be made at the primary election," N.Y. Elec. L. § 6-110—the Court ordered that judicial nominations shall proceed by primary election until the Legislature enacts corrective legislation. Fourth, the Court stayed all aspects of its remedy until after the 2006 election cycle. Judging by the most conservative time frame, this stay afforded the Legislature almost nine months in which to act before the 2007 election cycle would begin, and roughly 18 months' time in which to act before any judicially-ordered primary might occur.[13]
 
 
 198
 Defendants first contend that the District Court exceeded its discretion by enjoining sections 6-106 and 6-124 as unconstitutional on their face instead of as applied. We disagree. While we recognize that facial invalidation is strong medicine, the record evidence establishes, for the purposes of issuing a preliminary injunction, that New York's judicial nominating process excludes not just these plaintiffs, but all candidates lacking party support. In such a case, facial invalidation is proper. See, e.g., Lerman v. Bd. of Elections in the City of New York, 232 F.3d 135, 153 (2d Cir.2000).
 
 
 199
 Defendants next contend that instead of enjoining the whole of sections 6-106, 6-124, the District Court should have enjoined those sections only in part. They maintain that the District Court should have more closely tailored its relief to the burdens it identified by, for example, reducing the number of delegates allocated to each judicial district, allowing delegates to run at-large instead of within each assembly district, allowing delegates to pledge their affiliation on the primary ballot, relaxing the petitioning requirements, and extending the time between the primary election and the nominating convention to create a wider lobbying window.
 
 
 200
 However, defendants fail to recognize that they are inviting the District Court to act as a one-person legislative superchamber—precisely what is forbidden. Courts must refrain "from rewriting state law to conform it to constitutional requirements." Ayotte, 126 S.Ct. at 968 (internal quotation marks omitted and alterations incorporated). This limitation on a court's remedial power is especially applicable in the context of a state's electoral law because the constitutionally permissible options are numerous, "line-drawing is inherently complex" for a host of policy reasons, and therefore quintessentially legislative judgments must be brought to bear in determining how best to structure the democratic process. Id. Tinkering with the election mechanism would require that District Court not only rewrite aspects of the judicial election scheme, but also modify provisions, such as the 37-day petition window, that apply to candidates for a variety of offices in New York. The District Court did not exceed its discretion by declining to rewrite the various requirements of New York's judicial nominating scheme.
 
 
 201
 Defendants next contend that the District Court exceeded its discretion by enjoining sections 6-106 and 6-124 statewide, instead of only in those judicial districts as to which there was evidence of the scheme's exclusionary operation. We again disagree. As a practical matter, such an approach is highly undesirable because it would leave judicial nominations in a state of patchwork chaos. Further, there was nothing so localized about the evidence presented at the preliminary injunction hearing to confine its relevance to a particular group of judicial districts, especially given that Chief Judge Kaye's Commission concluded that "the uncontested evidence before [it] is that across the state, the system for selecting candidates for the Supreme Court vests almost total control in the hands of local political leaders." (emphasis added). We see no error in the statewide scope of the District Court's preliminary injunction.
 
 
 202
 Having rejected defendants' arguments concerning the prohibitory aspect of the District Court's order, we now turn to defendants' claim regarding the affirmative relief that the Court ordered. Defendants assert that the District Court ignored legislative intent when it ordered the State to conduct judicial primary elections until the Legislature enacts corrective legislation. In particular, defendants point to the fact that in 1921 New York replaced judicial primary elections with the current nominating system, thereby clearly evincing a judgment against holding primary elections for the office of Supreme Court Justice. In light of that historical fact, defendants contend that the District Court should have merely enjoined the offending provisions, left it to the Legislature to solve the problem, and not provided any interim, fallback nominating process.
 
 
 203
 We disagree with defendants for four reasons. First, we see little ultimate difference between what defendants claim the District Court should have done and what it actually did. If the District Court had merely enjoined the current nominating scheme, the default nature of section 6-110 would have resulted in a primary election by operation of law. By recognizing this, the District Court merely clarified the state of affairs that would exist, although less obviously, in any event.
 
 
 204
 Second, it would have been impractical, if not irresponsible, for the District Court to have left such a gaping hole in the State's electoral scheme. Lemon, 411 U.S. at 200, 93 S.Ct. 1463 ("[E]quitable remedies are a special blend of what is necessary, what is fair, and what is workable."). Third, the Legislature is free to enact a new nominating scheme well before any court-ordered primary might occur. The Court recognized that the choice of a final solution falls to the Legislature and stayed its interim remedy for nearly a year, which allows that body plenty of time to head off any possible primary election if it so desires. Indeed, just weeks after the District Court issued its decision, the State Senate passed a bill providing for primary elections for the office of Supreme Court Justice. See S. 55-A, 2005-06 Reg. Sess. (N.Y.2006). This development illustrates that the Legislature can indeed craft its own solution prior to the commencement of a primary election.
 
 
 205
 Fourth, the default nature of section 6-110 shows that, as a general matter, the State Legislature is not nearly as opposed to primary elections as defendants contend. In fact, nominations for other judicial offices, such as Civil Court Judge and County Court Judge, are made by primary election. See N.Y. Const. art. VI, § 10; N.Y. Elec. L. §§ 6-110, -168; see generally Ruiz v. Saez, 68 N.Y.2d 154, 506 N.Y.S.2d 429, 497 N.E.2d 959 (1986).
 
 
 206
 We come now to the final piece of business before us. At oral argument and in a subsequent submission to the Court, counsel for the State Attorney General and the State Legislature as amicus curiae requested that we further stay the District Court's injunction until after the 2007 election cycle, so that the District Court's remedy would not take effect until December 31, 2007. Until that time, the current nominating scheme would operate unabated.
 
 
 207
 Apart from the fact that the Attorney General and Legislature should have directed their request to the District Court in the first instance, see Fed. R.App. P. 8(a), it lacks merit. "In this Circuit, four factors are considered before staying the actions of a lower court: (1) whether the movant will suffer irreparable injury absent a stay, (2) whether a party will suffer irreparable injury if a stay is issued, (3) whether the movant has demonstrated a substantial possibility, although less than a likelihood of success, on appeal, and (4) the public interests that may be affected." Hirschfeld v. Bd. of Elections, 984 F.2d 35, 39 (2d Cir.1993) (internal quotation marks omitted).
 
 
 208
 None of these factors favor defendants. Defendants have failed to show an irreparable injury that they would suffer absent a stay. On the other hand, if the current electoral scheme persists for yet another election cycle, voters and candidates will continue to suffer irreparable constitutional injury. In this opinion we have rejected defendants' claims on appeal. Last, given the constitutional infirmity of New York's judicial nominating process, its continuation cuts sharply against the public interest. See Council of Alternative Political Parties v. Hooks, 121 F.3d 876, 883-84 (3d Cir.1997) ("In the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights, including the voting and associational rights of alternative political parties, their candidates, and their potential supporters.").
 
 
 209
 Further, as practical matter, there is more than one year's time between the issuance of this opinion and any possible primary election, which gives the Legislature sufficient time to consider and enact a new nominating scheme. Indeed, one house of the Legislature already has passed a new scheme, and did so only weeks after the District Court issued its opinion. In its submission to this Court, the Legislature has pledged to "move as expeditiously as necessary to devise a workable solution." We take it at its word.
 
 CONCLUSION
 
 210
 We hold that the District Court acted within its allowable discretion in finding a clear likelihood of success on plaintiffs' First Amendment claim because (1) the First Amendment affords voters and candidates the right to participate in New York's judicial nominating process free from burdens that are severe and unnecessary to further a compelling state interest; (2) the District Court applied the proper First Amendment standard; (3) a convention-based nominating system is not per se constitutional; (4) the parties' associational rights, by themselves, do not justify the current scheme; (5) a reasonable means of general election ballot access for independent or write-in candidates does not render the nominating process constitutional; (6) the nominating system imposes severe burdens on the associational rights of voters and candidates; and (7) the regulations are not narrowly tailored to serve a compelling state interest. We further hold that the District Court was not required to give notice pursuant to Fed.R.Civ.P. 65(a). Finally, we hold that the District Court acted within its allowable discretion by (1) enjoining defendants from enforcing N.Y. Elec. L. §§ 6-106, -124, and (2) requiring that nominations be settled by primary election until the State Legislature enacts corrective legislation. Accordingly, we AFFIRM the District Court's order dated January 27, 2006.
 
 APPENDIX
 
 211
 NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 Notes:
 
 
 [1]
 Although defendants do not challenge the associational standing of Common Cause/NY, and appear not to have done so below, we have considered the issuenostra sponte. See, e.g., Muntaqim v. Coombe, 449 F.3d 371, 374 (2d Cir.2006) (per curiam). At least at this point in the litigation, the record establishes that Common Cause/NY possesses associational standing because (1) there exists a clear likelihood that its members — 20,000 voters from across New York State — have suffered a concrete injury to their First Amendment rights that is fairly traceable to defendants' conduct and can be remedied by court action; (2) the First Amendment associational interests that this suit seeks to vindicate are germane to Common Cause/NY's purpose of making "government more responsive and open to citizens, [restoring] ethics in government, and [curbing] the influence of special interest money in politics"; and (3) neither the claim asserted nor the injunctive and declaratory relief requested requires that Common Cause/NY's individual members participate in the suit. See generally Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343-44, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); cf. Common Cause v. Bolger, 512 F.Supp. 26, 29-31 (D.D.C.1980) (three-judge panel).
 
 
 [2]
 The nominating process described above applies only to political "parties." New York law defines a political "party" as "any political organization which at the last preceding election for governor polled at least fifty thousand votes for its candidate for governor." N.Y. Elec. L. § 1-104(3). State law classifies as "independent bod[ies]" other political entities that do not achieve party status. N.Y. Elec. L. § 1-104(12)
 
 
 [3]
 While the State Democratic Party allots each assembly district two slots on the party's state committee,see Rules of the Democratic Party of the State of New York, art. II, § 1(b), (c), the New York County Democratic Party allows for the election of more than two district leaders per assembly district, see Rules and Regs. of the Democratic Party of the County of New York, art. III, § 1. Accordingly, in Manhattan there are more Democratic district leaders than state committee members, and the two positions are not necessarily congruous.
 
 
 [4]
 The Ninth Judicial District consists of four small counties with few judicial delegates, and one much larger county, Westchester, with a judicial delegation big enough to effectively control the nominating process
 
 
 [5]
 Farrell gave that deposition testimony in connection with another case,France v. Pataki, 71 F.Supp.2d 317 (S.D.N.Y.1999). Defendants did not call Farrell to testify in this case.
 
 
 [6]
 Although the Second Judicial District also includes Richmond County, Kings County is several times larger, and thus the Kings County judicial delegation controls the nominating convention
 
 
 [7]
 The Court did credit one example of a candidate securing the nomination over the objection of a county leader in the Eighth Judicial District. However, based on news reports, the District Court found that an internal dispute within the Erie County Democratic Party, which eventually led to the ouster of the county leader, caused the event. Further, the Court found that this was the only example in the past 25 years of a candidate securing his party's nomination over the objection of a county leader
 
 
 [8]
 For the purposes of our analysis we assume without deciding that promoting geographic diversity is a compelling state interest. Further, like the District Court, we assume that defendants do not claim that the state's interest lies in protecting incumbentsper se, but rather in protecting sitting judges from the appearance of partiality that may attend fundraising and other necessary electoral activities.
 
 
 [9]
 Party raiding is "a practice whereby voters in sympathy with one party designate themselves as voters of another party so as to influence or determine the results of the other party's primary."Tashjian v. Republican Party of Conn., 479 U.S. 208, 219, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) (internal quotation marks omitted).
 
 
 [10]
 Unlike the prevention of party raiding, case law has not recognized a compellingstate interest in guarding a party's ability to create balanced slates. For the purpose of our analysis, we assume that slate-balancing is a compelling state interest.
 
 
 [11]
 Although it is not reflected in the record, we note that in 2005 the Ninth Judicial District elected a black Supreme Court Justice. This development does not alter our analysis: only one of the judicial district's 25 justices is a minority,i.e., 4 percent, while minorities make up 27 percent of the district's voting age population.
 
 
 [12]
 Moreover, the current system does not even value geographic residency requirements: Justices are not required to live in the judicial district in which they sit. In fact, upstate Justices routinely are assigned to sit in New York City when caseloads require
 
 
 [13]
 Counsel for the Attorney General and the State Legislature claimed in oral argument that the election cycle begins in December, fully nine months before the judicial nominating convention, when sitting Justices may begin campaigning by lawSee N.Y. Comp. Codes R. & Regs. tit. 22, §§ 100.0(Q), 100.5. Although nothing in the record reflects that election activities actually begin that early, we afford defendants the benefit of the doubt on this point.